In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2968

GERALD OVERMAN,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 06 C 484—**Barbara B. Crabb**, *Chief Judge.*

ARGUED JULY 9, 2008—DECIDED OCTOBER 7, 2008

Before POSNER, SYKES, and TINDER, *Circuit Judges.*

PER CURIAM. Gerald Overman applied for Social Security disability insurance benefits and supplemental security income payments, claiming that he was unable to work due primarily to fatigue related to Graves' disease, anemia, and vision problems. After conducting a hearing an Administrative Law Judge ("ALJ") denied benefits, relying on testimony by a vocational expert ("VE") to find that, though Overman could not return to his past work, he could perform a significant number of other available

jobs. On review by the district court, the court found that substantial evidence supported the ALJ's conclusion. In this appeal, Overman challenges the ALJ's reliance on the VE's testimony. We will discuss the record that was before the ALJ prior to addressing those contentions.

Overman, currently 58 years old, is a high-school gradu-ate. For fifteen years before the alleged onset of disability, he worked at a resort. His duties included maintaining and repairing the golf course irrigation system, setting up for conventions, and performing other small repairs. In 2003 Overman began to feel overheated, shaky, and fatigued on a regular basis, and he experienced a rapid, unexplained weight loss of more than 70 pounds. In November of that year, Overman—who already suffered from diabetes, hypertension, glaucoma, cataracts, and severe myopia—quit his job because he was too fatigued to continue working.

Overman reported his symptoms to his treating physi-cian, Dr. John McKevett, and was referred to an endocri-nologist who diagnosed Overman with Graves' disease, a form of hyperthyroidism that may cause weight loss, tremulousness, and weakness, among other symptoms. STEDMAN'S MEDICAL DICTIONARY 557, 928 (28th ed. 2006). Graves' disease is chronic, but the symptoms are treat-able. *See* MayoClinic.com, Graves' Disease (July 6, 2007), http://www.mayoclinic.com/health/graves-disease/ DS00181/DSECTION= treatments-and-drugs. He also was diagnosed with anemia, which frequently causes fatigue and lethargy in its sufferer. STEDMAN'S MEDICAL DICTIONARY at 78.

Overman began radioactive iodine therapy for his Graves' disease in late December 2003. He filed his application for benefits shortly thereafter. The therapy initially alleviated some of Overman's symptoms, but then instead of producing too much thyroid hormone, Overman began producing too little, a condition called *hypo*thyroidism, which (like *hyper*thyroidism) often causes fatigue and muscle weakness. STEDMAN'S MEDICAL DICTIONARY at 939, 1277. (Roughly 70% of patients treated with radioactive iodine experience this overcorrection of thyroid function, after which they usually require lifelong thyroid hormone replacement therapy.) Endocrinologists tested Overman's thyroid function every four to eight weeks throughout 2004 and sent the results to Dr. McKevett, who prescribed a thyroid-hormone replacement drug called Synthroid. After taking Synthroid for two weeks, Overman told Dr. McKevett that he still tired easily but his energy level was "slowly but surely improving." At the same visit, the doctor noted "moderate generalized weakness," but stated that this was also "slowly improving." Dr. McKevett's records reflect that Overman's dosage of Synthroid was adjusted several times over the next 18 months. But by the end of that period, Dr. McKevett still had not determined the correct dosage and attributed Overman's continued fatigue to "not being conditioned" to the medication. As for Overman's anemia, the records do not mention any treatment for that ailment, and Overman did not know at the time of his hearing whether he was still anemic.

Overman also submitted records from his optometrist and opthalmologist concerning his vision problems. The

opthalmologist reported that Overman suffered from "pathologic myopia," glaucoma, and cataracts. He said that Overman's visual acuity of 20/80 made "any visual task difficult" and his eyesight would continue to deteriorate. His optometrist reported that Overman had "open angle" glaucoma and myopic degeneration resulting in "poor vision in general" and "almost no night vision." Both doctors agreed that Overman's vision would likely worsen over time. The medical records show that Overman's diabetes and hypertension were, for the most part, well-controlled during the alleged period of disability.

At the hearing before the ALJ in November 2005, Overman testified that he was still taking Synthroid for his thyroid condition but that his doctor had not yet determined the correct dosage. He also testified that he took medication for his diabetes but was not insulin-dependent. He said that he was nearsighted, wore glasses, and could watch TV as long as he was within five feet of the set. Regarding his daily activities, Overman testified that he tries to do things around the house but finds it very tiring and that, during the six months prior to the hearing, if he sat down in a chair for more than five minutes he would fall asleep. Overman testified that he could feed and bathe himself and that his performance of household chores did not significantly change after the onset of disability in November 2003. He said that he could drive during the day but not after dark as he had "no night vision." He also said that he could walk a half mile on flat terrain as long as it was not too cold out, but that in the cold his extremities go numb due to his diabetes. He said that the numbness had worsened over time and was

not always associated with cold temperatures. Finally, Overman testified that his resort maintenance job had been unskilled and primarily required making small repairs to door knobs, light switch covers, and the like. He left the job in November 2003 after fainting at work. He said that he would not be able to return to that job because he could not tolerate working outdoors in hot weather and because he was routinely required to lift more weight than Dr. McKevett recommended.

Dr. Julianne Koski, a family practitioner and agency consultant, also testified at the hearing. Having reviewed Overman's medical records, Dr. Koski concurred that Overman suffered from Graves' disease, severe myopia with glaucoma, diabetes, and hypertension. She testified that it was difficult to determine Overman's corrected visual acuity from his medical records, but she guessed that it was no better than 20/100 when corrected with glasses. She also concurred that he suffered from cataracts, which, in her opinion, were not yet "visually significant." Dr. Koski opined that none of Overman's impairments met or equaled Social Security medical listings, so she analyzed how, in her view, his ailments impacted his residual functional capacity. She said that Overman could not perform work requiring fine discrimination or significant reading, should stay away from hazards and extreme temperatures, should avoid all ropes and scaffolding and climb ladders only occasionally, should never lift more than fifty pounds but could lift twenty pounds "on a more frequent basis," and should not do any repetitive over-the-shoulder lifting. She did not recommend any limitations on Overman's ability to sit or stand.

The last witness at the hearing was the vocational expert ("VE"), Kenneth Ogren. The ALJ asked the VE, hypothetically, whether a person with a residual functional capacity as described by Dr. Koski—including the limitations on reading, fine discrimination, and extreme temperatures—could do any of Overman's past relevant work. The VE answered that the extreme-temperatures limitation ruled out Overman's prior work, much of which was performed outdoors. The ALJ then asked, hypothetically, whether there were other jobs in the region that a person with those same limitations could perform. The VE answered that such a person could perform two occupations: "hand packager, and that is at DOT 920.587-018. . . . [and] Rack room worker, 920.665-014." A "hand packager" manually packages materials and products, and a "rack-room worker" tends machines that fill metal kegs with beer in the keg-filling (or racking) room of a brewery; both positions require a "medium" level of exertion. *See* DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES 932-33 (4th ed. rev. 1991), *available at* http://www.oalj.dol.gov/libdot.htm. According to the VE, there were 1,200 and 800 such jobs, respectively, available in Minnesota. (The district court rejected Overman's argument that the VE should have used a Wisconsin rather than a Minnesota database to evaluate the number of available jobs, but Overman does not renew that argument on appeal.) Finally, the ALJ asked the VE whether his testimony was consistent with the Dictionary of Occupational Titles ("DOT"), and the VE answered "yes."

Overman's counsel then cross-examined the VE as follows:

Counsel: And then if you assume a person couldn't do, couldn't do close up work because of finger problems, hand problems, that sort of thing, would that change your opinion on this?

VE: Yes.

Counsel: How would it change it?

VE: It would eliminate the two jobs.

Counsel: Pardon me?

VE: It would eliminate both occupations.

Counsel: And why is that?

VE: Basically you have to have at least some vision to do the packaging I'm talking about and some vision to hang articles on racks.

Counsel: And as I understand the doctor, she was saying he could do things with gross discrimination, but he couldn't do it with the fine discrimination?

VE: Yes. That's the way I understood it too.

Counsel: And as I understand it, that means, and correct me if I'm wrong, he can't work up close because he can't really see his hands, is that it?

VE: I guess the way I interpreted that is that he couldn't do like small assemblies and things like that, smaller type work.

Counsel: Uh-huh. But we're talking about packaging of objects into a box then versus actual fine manipulation?

VE: Yes.

Counsel: Then I guess it's a matter of degree, isn't it.

VE: Yes.

Counsel: So those may well be eliminated as well?

VE: The smaller parts, yes.

Counsel: By the fact that he's sitting there trying to do things close up, right?

VE: Exactly.

Counsel: All right. And I suppose I would have to, that would also get in to the issue of what's on the labeling and how you would package it and how it would have to be packaged, that sort of thing.

VE: If he had to read to do it, I would say those jobs would be eliminated, yes.

Counsel: So then there would be no jobs in the national economy, if you assume he couldn't do it because it was close work?

VE: Yeah, I eliminated those possibilities already.

In determining that Overman was not disabled, the ALJ performed the usual five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920. According to the ALJ, Overman had not engaged in substantial work since his claimed onset date, and he was severely impaired, but none of his impairments were severe enough to presumptively preclude gainful work. *See id.* § 404, subpt. P, app. 1. The ALJ then found that Overman could perform work

of "medium" exertion with limitations virtually identical to those described at the hearing by Dr. Koski, including gross but not fine discrimination, no significant reading tasks, and no extremes of cold or heat. The ALJ concluded that these limitations would preclude Overman's past relevant work. However, the ALJ found that Overman was not disabled at step five because he could work as a hand packager or a rack-room worker. The ALJ stated that, in reaching this conclusion, he gave "great weight" to the VE's testimony, which the ALJ found "credible, persuasive, and consistent with the record as a whole." The ALJ also noted that the VE had confirmed that his testimony was consistent with the DOT. As for the VE's testimony on cross-examination, the ALJ did not interpret his statements to suggest that Overman's limitations would prevent him from working as a hand packager or rack-room worker. Rather, under the ALJ's reading of the testimony, the VE simply explained that he had previously eliminated from consideration jobs requiring the type of small assembly work and reading that Overman is unable to do before arriving at the conclusion that there were some 2,000 jobs in Minnesota available to Overman despite his limitations.

The Appeals Council denied Overman's request for review, making the ALJ's ruling the Commissioner's final decision. *See, e.g.*, *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). Overman sought review in the district court, *see* 42 U.S.C. § 405(g), and, as noted, the district court upheld the ALJ's decision. And now we address the claims of error that Overman raises in this appeal.

We review the ALJ's decision deferentially, upholding it if it is supported by substantial evidence. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "Evidence is 'substantial' if it is sufficient for a reasonable person to accept as adequate to support the decision." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (internal quotation marks and citation omitted). "Although this standard is generous, it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). We view the record as a whole but do not reweigh the evidence or substitute our judgment for that of the ALJ. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

First, the VE's testimony that Overman could work as a hand packager or rack-room worker conflicts in several respects with descriptions of those positions in the DOT. Overman, according to the ALJ, must avoid extremes of cold and heat, and his vision problems preclude both fine discrimination and significant reading. A hand packager, however, must deal with extreme heat "frequently" (between one-third to two-thirds of the workday), and "near acuity"—clarity of vision at 20 inches or less—is required "occasionally" (up to one-third of the workday). *See* DEP'T OF LABOR, SELECTED CHARACTERISTICS OF OCCUPATIONS DEFINED IN THE REVISED DICTIONARY OF OCCUPATIONAL TITLES 316, C-3 to C-4, D-1 (1993). For a rack-room worker, near acuity is required frequently. *See id.* at 316, C-3 to C-4. Both positions require workers to read at a rate of 95-120 words per minute and to be able to compare similarities and differences between words and between series of numbers. *See* DEP'T OF LABOR,

DICTIONARY OF OCCUPATIONAL TITLES at 932-33, 1010-11. The Commissioner concedes on appeal that the VE's testimony conflicts with the DOT; the issue is whether that conflict necessitates remand.

Overman argues that (1) the ALJ violated Social Security Ruling 00-4p by failing to require the VE to explain the conflict, and (2) the VE's flawed testimony cannot satisfy the Commissioner's burden at step five to prove that Overman can perform other jobs despite his limitations. Under SSR 00-4p, an ALJ has an "affirmative responsibility" to ask whether a vocational expert's evidence "conflicts with information provided in the DOT" before relying on that evidence to support a determination of nondisability. SSR 00-4p at 4; *see Massachi v. Astrue*, 486 F.3d 1149, 1152-53 (9th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). Here, the ALJ satisfied this first step by asking the VE if his testimony was consistent with the DOT; the VE answered (wrongly, as it turns out) that it was. If evidence from a VE "appears to conflict with the DOT," SSR 00-4p requires further inquiry: an ALJ must obtain "a reasonable explanation for the apparent conflict." SSR 00-4p at 5. It is here, Overman argues, that the ALJ failed in his duty. Even though his counsel never identified any apparent conflicts at the time of the hearing, Overman argues that the discrepancies between the DOT definitions and the VE's testimony were so obvious that the ALJ's duty to investigate was triggered.

The Commissioner counters that the conceded conflicts were not obvious and that Overman forfeited any argument under SSR 00-4p because he did not raise it at the

hearing. For the latter proposition the Commissioner cites *Donahue v. Barnhart*, 279 F.3d 441, 446-47 (7th Cir. 2002). But we held more recently that because SSR 00-4p imposes an affirmative duty *on the ALJ* to inquire into and resolve apparent conflicts, a claimant's failure to raise a possible violation of SSR 00-4p at the administrative level does not forfeit the right to argue later that a violation occurred. *See Prochaska*, 454 F.3d at 735 (calling language to the contrary in *Donahue* dicta). The Commissioner attempts to distinguish *Prochaska* by pointing out that in that case the ALJ violated SSR 00-4p at the first step by never asking the VE whether his testimony was consistent with the DOT. But *Prochaska* makes clear that the ALJ's affirmative duty extends beyond merely asking the VE whether his testimony is consistent with the DOT; the ALJ also must "elicit a reasonable explanation for any discrepancy." *Prochaska*, 454 F.3d at 735 (quoting *Haddock v. Apfel*, 196 F.3d 1084, 1087 (10th Cir. 1999)). Overman was denied the opportunity to appeal at the administrative level, and he raised the SSR 00-4p issue before the district court, so he has not forfeited the argument. *See Prochaska*, 454 F.3d at 735.

Still, the failure of Overman's counsel to identify the conflicts at the time of the hearing is not without consequence. Overman now has to argue that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance, for SSR 00-4p requires only that the ALJ investigate and resolve *apparent* conflicts between the VE's evidence and the DOT. SSR 00-4p; *see also, e.g.*, *Prochaska*, 454 F.3d at 735 ("*If* the VE's . . . evidence appears to conflict with the Dictionary of Occupational Titles, the adjudicator will obtain a reason-

able explanation for the apparent conflict." (emphasis added)).

Overman identifies two "apparent conflicts" in the VE's testimony that, in his view, the ALJ was required to investigate further. After testifying on direct that Overman could perform two occupations listed in the DOT despite his limited vision and reading ability, the VE contradicted himself on cross-examination, first by saying that an inability to do "close up work" would eliminate both jobs and second by saying that Overman would be unable to work as a hand packager if that position required reading. The Commissioner argues that Overman's counsel elicited these seemingly contradictory statements by imposing alternate, more restrictive hypothetical limitations than the ALJ had on direct. According to the Commissioner, counsel's question about "close up work" introduced a limitation that Overman lacked full use of his hands, which was not included when the ALJ questioned the VE. But that argument is undermined by the fact that the VE discussed visual acuity rather than manipulative ability when he testified that a limitation on "close up work" would eliminate both jobs "because you have to have at least some vision." The Commissioner likewise attempts to reconcile the VE's statement that a reading limitation would preclude work as a hand packager by suggesting that "the ability to engage in significant reading was specifically excluded from the ALJ's hypothetical," but that is incorrect. The ALJ specified "no significant amount of reading tasks" in his hypothetical questions on direct. The conflicts between the VE's supposedly DOT-based testimony on direct and

his statements on cross-examination, therefore, should have been apparent to the ALJ. And it appears that perhaps they *were* apparent, if not at the time of the hearing, at least by the time the ALJ produced his ruling, in which he attempts to rescue the testimony by interpreting the statement that certain jobs would be eliminated as a description of jobs the VE had *previously* eliminated before reaching his conclusion that 2,000 jobs remained. Whether that is or is not a plausible reading of the testimony, the ALJ's attempt to explain away the seemingly contradictory statements is tantamount to an acknowledgment that there were apparent discrepancies. The ALJ's reliance upon the VE's testimony without developing the record and obtaining a "reasonable explanation" for the conflicts violated SSR 00-4p.

Even if this was not the case, Overman also persuasively argues that the ALJ's ruling is not supported by substantial evidence because it is premised on the VE's "flawed" testimony. The Commissioner bears the step-five burden of establishing that the claimant can perform other work that "exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(2); *see also Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). A VE's testimony can satisfy this burden only if that testimony is *reliable*. *Britton*, 521 F.3d at 803; *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004); *Donahue*, 279 F.3d at 446. "A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Britton*, 521 F.3d at 803.

The Commissioner argues that the ALJ was entitled to rely on the VE's testimony in spite of the later-identified conflict with the DOT because an ALJ is permitted to give VE testimony precedence over the DOT. In an appropriate case this proposition would be correct, but it is not well founded here. An ALJ is free to accept testimony from a VE that conflicts with the DOT when, for example, the VE's experience and knowledge in a given situation exceeds that of the DOT's authors, *Donahue*, 279 F.3d at 446, or when the VE's contrary testimony is based on information in "other reliable publications," SSR 00-4p. But here the VE said that his testimony was *consistent* with the DOT, so the Commissioner's implicit suggestion that the VE had some hidden knowledge that would explain away the conflicts with the DOT is frivolous.

Finally, the Commissioner argues that the ALJ's reliance upon the VE's testimony is not reversible error because an ALJ may rely on a VE's "bottom-line" or "purely conclusional" testimony, so long as the data and reasoning underlying the opinion are "available on demand." *Donahue*, 279 F.3d at 446; *see also Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004). In both *Donahue* and *Barrett*, we ruled that an ALJ may rely on imperfect VE testimony if a claimant does not question the basis for the testimony at the time of the hearing. *See Donahue*, 279 F.3d at 446 (ruling that ALJ may rely on unchallenged VE testimony that conflicted with DOT); *Barrett*, 355 F.3d at 1067 (ruling that ALJ may rely on unchallenged, perfunctory VE testimony). According to the Commissioner, the ALJ in this case was entitled to rely on the VE's "unchallenged" and "uncontradicted" testimony because Overman never questioned its foundation.

But Overman *did* challenge the VE's testimony. Unlike in *Donahue* and *Barrett*, Overman's counsel cross-examined the VE and elicited statements that seriously called into question the reliability of the VE's bottom-line conclusions. Perhaps Overman's inquiry into the basis for the VE's testimony could have been more thorough. But a disability adjudication is "a hybrid between the adversarial and inquisitorial models," *Donahue*, 279 F.3d at 446, and if the basis of the VE's testimony is questioned at the hearing, "then the ALJ should make an inquiry . . . to find out whether the purported expert's conclusions are reliable," *id.*; *see also McKinnie*, 368 F.3d at 911. No such inquiry was performed here. Instead, the ALJ unquestioningly relied on the VE's bottom line, a bottom line later determined to be in irreconcilable conflict with the DOT. There may be additional work of which Overman is capable of performing, but the record does not support the conclusion that he can perform either of the two positions identified by the VE.

The ALJ based his finding that Overman could perform other work entirely on the VE's erroneous testimony, and that testimony is not "sufficient for a reasonable person to accept as adequate to support the decision." *Jens*, 347 F.3d at 212. Consequently, the ALJ's disability determination is not supported by substantial evidence. *See Boone v. Barnhart*, 353 F.3d 203, 206, 208-09 (3d Cir. 2003) (ruling that VE's testimony does not by itself provide substantial evidence of claimant's ability to perform significant number of other jobs when testimony conflicts with DOT and neither VE nor ALJ acknowledge or explain conflict); *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000) (noting

that VE's "erroneous characterization of the exertional level or skills required to perform a particular job calls into question both the probative value and reliability of the expert's testimony" and finding that ALJ may rely upon such evidence only if "the record reflects an adequate basis for doing so"). Because the ALJ's ruling was premised entirely on testimony that conflicted with the DOT and otherwise was vague and confusing, this case must be remanded for further proceedings.

## Conclusion

For the reasons stated above, the judgment of the district court is REVERSED and the case is REMANDED for further consideration by the agency.