NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 18, 2009
Decided January 29,  2010

**Before**

DIANE P. WOOD, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 08-4298

| | |
|---|---|
| MARGARET A. SEAMON, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Western District of |
| | Wisconsin. |
| *v.* | |
| | No. 07-cv-0588-bbc |
| MICHAEL J. ASTRUE, | |
| Commissioner of Social Security, | Barbara B. Crabb, |
| *Defendant-Appellee.* | *Chief Judge.* |

**O R D E R**

Margaret Seamon first applied for disability insurance benefits in June 2002, asserting that she had been unable to work since the beginning of that year because of numerous physical and mental health problems, in particular chronic pain from back and neck injuries, depression, and anxiety disorders. The administrative law judge ("ALJ") initially denied her claim, but she appealed to the district court and won a remand for further proceedings. The second time around the ALJ returned a partially favorable decision, awarding benefits as of October 6, 2006 (the date on which her advanced age qualified her as disabled), and denying benefits for any earlier time. Upon Seamon's second appeal, the district court affirmed. She has now turned to this court for further review. Because the ALJ's decision is supported by substantial evidence, we affirm.

**I**

In December 2001, while working as an office clerk, Seamon (then 49 years old) suffered a slip-and-fall accident on the job that resulted in injuries to her neck, arm, and shoulder. The accident also exacerbated other underlying knee, back, and chronic pain issues that had plagued her for years. Hoping to obtain an accurate diagnosis and an effective treatment plan for her pain, Seamon made countless trips to various doctors.

As of the time of the accident, Seamon already had a long history of depression, post-traumatic stress disorder ("PTSD"), and anxiety disorders. After the accident, she lost her job in January 2002 because of excessive absenteeism. Stress over the job loss, plus the pain from her accident, then precipitated a marked deterioration in her mental health. Prior to the accident, her mental health problems had been managed adequately with medication and counseling, but by May 2002, her feelings of intense anger and hopelessness prompted her to seek more extensive treatment from psychiatrist Dr. John Bartholow and regular counseling services from psychologist Scott Phillips.

Seamon's depression worsened in the fall of 2002. She continued to see Dr. Bartholow and Phillips, to whom she described increased feelings of despair, self-imposed social isolation, anger, and problems with memory and concentration. Dr. Bartholow made several adjustments to her medication. She reported some benefits from this, but she also experienced more frequent thoughts of suicide and appeared more tearful, overwhelmed, and frustrated at appointments. Dr. Bartholow added a diagnosis of possible bipolar disorder after Seamon prompted Phillips to complete a screening diagnostic for that condition. Phillips commented that Seamon took a dramatic approach to the test and endorsed every symptom of mania or hypomania.

Around the same time, Seamon was also evaluated by a number of state agency doctors, including Dr. Richard Fuhrer. Dr. Fuhrer found that while Seamon was generally very pleasant, her mood fluctuated greatly, and she expressed intense anger when discussing prior instances of mistreatment. He administered the Minnesota Multiphasic Personality Inventory ("MMPI-II") and the Millon Clinical Multiaxial Inventory-III, but he concluded that any results were of questionable validity because Seamon exaggerated in her responses and claimed to have a "tremendous number of symptoms" that were inconsistent across the two tests. Yet he also reported that Seamon scored a 50 on the Global Assessment of Functioning ("GAF") test, indicating a serious level of depression.

Meanwhile, Seamon was becoming frustrated with her doctors and their apparent lack of support for her disability application. In November 2002 she abruptly ended treatment with Dr. Bartholow and Phillips after leaving an angry voice message for Phillips

accusing him of betrayal. Seamon explained that she had stopped taking her medications and refused to return for therapy because she could not trust anyone. The last proved to be an overstatement: five days later, she reinitiated treatment with a former psychiatrist.

From December 2002 through February 2003, Seamon experienced severe mental health problems. She was admitted to the emergency room twice for suicidal thoughts and an attempted overdose of sleeping pills, and the hospital doctors reported that her mental health had become more fragile. Her condition improved, however, and she was discharged from the hospital several days later. After her second hospitalization Seamon stopped taking her medications regularly and decided to have her psychiatric problems treated exclusively by her primary care physician.

During her first hearing before the ALJ in October 2003, Seamon said that her mental condition was improving; for that reason, she initially requested benefits only through June of that year. She explained that it was her inability to find a job and the changes in her medication that caused the temporary decline in her mental health. After performing the requisite five-step analysis, see 20 C.F.R. § 404.1520, the ALJ concluded that: (1) Seamon had not engaged in gainful work since January 2002; (2) she had a number of severe physical and mental health problems; (3) none of these issues either individually or in combination met the listing requirements in 20 C.F.R. pt. 404, subpt. P, app.1; (4) Seamon had the residual functional capacity ("RFC") to perform unskilled work subject to a number of postural and environmental limitations in addition to restrictions of "brief and superficial contact with the public" and "no high production goals"; and (5) Seamon was not disabled because a person of her age, education, work experience, and RFC could perform a significant number of jobs.

On appeal, the district court remanded the case, because the ALJ had not obtained a proper waiver of counsel and had given too much weight to Seamon's un-counseled statements about improvements in her condition. The court also thought that the ALJ had not defined her RFC properly, because he had restricted only her contact with the public, and he should have included a similar restriction on contact with coworkers and supervisors.

During the hearing on remand, the ALJ told the vocational expert ("VE") that the key question was whether jobs existed for someone who was limited to "brief and superficial contact with others in the work place." The VE concluded that there were such jobs, including those of a shoe brusher or a cafeteria attendant. On cross-examination Seamon's attorney asked the VE whether a person who could not keep pace or "do 80 percent or 75 percent of what is normally expected" would be able to perform either job. The VE replied in the negative. Seamon pressed him to explain what percentage of work an employee must

be able to do and the VE responded "100 percent." Seamon also asked whether an employee could still do the identified jobs if she was involved in altercations at work, and the VE admitted that such behavior would also eliminate those jobs.

In December 2006, after the second hearing but before the ALJ's decision, Seamon solicited a supplemental psychiatric evaluation from Dr. Paul Caillier. Dr. Caillier conducted one clinical examination and quickly reviewed a small sample of Seamon's medical records through late 2002. He concluded that Seamon's MMPI-II results indicated she suffered from a somatoform disorder, and that the medical records showed that Seamon's mental health had gradually deteriorated to a point where she was "now totally unemployable."

Dr. Caillier's report was submitted to the ALJ, who again went through the five-step process. This time the ALJ found Seamon disabled as of October 6, 2006. In so finding, however, he did not rely on Dr. Caillier's report. Instead, he concluded that Seamon's age had become the definitive factor. The Medical-Vocational Guidelines list new disability criteria for people over 55, and, knowing that Seamon's disability coverage would expire in December of 2006, the ALJ exercised his discretion under 20 C.F.R. § 404.1563(b) to deem Seamon of "advanced age" six months before her 55th birthday (April 6, 2007). Although the ALJ recognized that Seamon's condition was more severe in late 2002 and early 2003, when she attempted suicide, that period did not meet the 12-month durational requirement described in 42 U.S.C. § 423(d)(1)(A), nor was it representative of the typical severity of her mental illness. The ALJ also noted that Dr. Caillier's findings in December 2006 were consistent with his decision to grant disability benefits beginning in October of that year.

In reaching this result the ALJ discredited much of Seamon's testimony, finding numerous inconsistencies between her assertions about the severity of her mental health problems and the objective medical evidence. Seamon's failure to take her prescribed medications and her decision to discontinue specialized psychiatric treatment after her hospitalizations, in his view, indicated that her mental health problems were not disabling. The ALJ also noted that Seamon's doctors reported that she had exaggerated her symptoms, and that her participation in two social outings undermined her claims of total social isolation.

## II

Seamon offers a number of reasons why we should find that the ALJ erred, but our review is deferential, and this is a case with an extensive factual record. We ask only whether substantial evidence supported the ALJ's conclusion. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008).

Seamon begins with the argument that the ALJ erred when, allegedly relying only on his own lay opinion, he formulated her RFC and included only two mental-health limitations, in the areas of social functioning and concentration, persistence, and pace. Evidence in the record, Seamon urges, shows that her RFC should also have reflected her anger, anxiety, moodiness, and social difficulties.

An ALJ may not "play doctor" by substituting his opinion for that of a physician. *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2005). The ALJ, however, is not only allowed to, but indeed must, weigh the evidence and make appropriate inferences from the record. See *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). We conclude that the ALJ's determination of Seamon's RFC is supported by substantial evidence in the record. The opinion reflects a thorough review of Seamon's medical records and a reasonable weighing of the evidence both for and against greater RFC limitations. For example, in determining that a moderate limitation on social functioning was appropriate, the ALJ noted that although Seamon's doctors observed moodiness, poor interpersonal skills, and frequent anger, they also reported that she was typically bright, cooperative, and pleasant. Similarly, the ALJ compared Seamon's testimony about her memory problems and inability to concentrate on a television program for more than a few minutes with reports from Drs. Fuhrer and Caillier concluding that she demonstrated acceptable levels of concentration. With that evidence in mind, he found that a moderate limitation in concentration, persistence, and pace was appropriate.

In focusing on selections from her medical records that reflect the most serious or extreme descriptions of her mental health problems, Seamon herself ignores significant evidence contradicting her position. In particular, we are not persuaded by Seamon's arguments that Dr. Caillier's psychiatric evaluation supports more extensive RFC limitations. Dr. Caillier was a non-treating physician, and his supplemental report, based on a limited examination and review of Seamon's medical history, deserves little weight.

Second, Seamon criticizes the hypotheticals the ALJ posed to the VE. The ALJ, she charges, did not properly account for the medical evidence documenting her most severe mental health symptoms. Mirroring her point about the RFC determination, she argues that the hypotheticals should have included additional restrictions targeted at her difficulty handling anger and stress.

Ordinarily, an ALJ's hypothetical questions to a vocational expert "must include *all* limitations supported by medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). The reference to "all" limitations, however, does not encompass those

that find no support in the record; the ALJ's hypothetical should incorporate only those limitations that he accepts as credible. *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007).

Here, the hypotheticals reflected the two limitations the ALJ included in Seamon's RFC; nothing more was required. The ALJ accounted for Seamon's moderate limitation in social functioning by restricting her to "brief and superficial contact with others," and the ALJ captured her moderate limitation in concentration, persistence, and pace when he included a restriction of "no high production goals." Compare *Britton v. Astrue*, 521 F.3d 799, 802 (7th Cir. 2008) (restricting contact with public and interaction with coworkers); *Arnold v. Barnhart*, 473 F.3d 816, 820 (7th Cir. 2007) (using low production standards for moderate limitation in concentration, persistence, and pace); *Schmidt*, 496 F.3d at 844-45 (using low production goals to account for problems with stress). We recognize that Seamon suffered in the past from serious problems, but we are satisfied that the ALJ adequately considered her overall mental health from 2002 through 2006 and included in his hypotheticals the limitations that were supported by the record.

Next, Seamon argues that the ALJ committed reversible error at step five when he supposedly ignored testimony from the VE stating that Seamon's moderate limitations rendered her incapable of performing the two jobs he identified. Although it is true that an ALJ cannot ignore an entire line of evidence, see *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995), Seamon's argument reads too much into the VE's statement. She is referring to the exchange mentioned above, in which the VE was asked "what percentage do you have to do of what's expected of you, is there a range?" The VE responded, "Well, I would think it would be 100 percent." Seamon interprets this exchange as a statement by the VE that a person in the jobs that the VE identified must stay on task 100% of the time – no coffee breaks, no lunch break, nothing. But no employer has such extreme expectations. Read sensibly, the VE appears to have been saying only that a person must "meet expectations" of the employer – that is, perform all aspects of the job competently, show up for work regularly, and so forth.

Seamon also argues that the ALJ should have found her disabled at step five based on the VE's testimony that an employee would be unable to do the two identified jobs if she were involved in altercations at work. But there is no evidence that Seamon's mental health problems would lead to altercations at work and, thus, the premise for counsel's questions was unsupported by the record.

Seamon's fourth argument rests on the uncontested point that the ALJ failed to perform his affirmative duty to ask about any conflicts between the VE's testimony and the descriptions of the identified jobs in the Directory of Occupational Titles ("DOT"). SSR 00-4p; see also *Overman*, 546 F.3d at 462-63. Seamon argues that the positions of shoe brusher

and cafeteria attendant correspond to DOT job classifications that involve either "serving" and "taking instructions and helping." This demonstrates, in her opinion, that both positions require more than "brief and superficial contact with others" and thus that they should have been excluded given her RFC. Furthermore, she argues that these positions necessarily require frequent overhead reaching, which the ALJ also precluded in the RFC.

We do not read the DOT descriptions as expansively as Seamon does. Neither position requires more than brief contact with others, and, even though the brusher position may require significant *lateral* reaching, there is no evidence that either position would require frequent *overhead* reaching. Because there is no actual conflict between the VE's testimony and the DOT, the ALJ's oversight is harmless error. See *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009).

Finally, Seamon argues that the ALJ improperly discredited her testimony. She challenges three of the reasons the ALJ cited for his adverse credibility finding. First, Seamon claims that the ALJ should have considered whether her mistrust of psychiatrists prevented her from seeking consistent treatment and from taking her medication regularly. Next, she suggests that the ALJ failed to decide whether the evidence of symptom exaggeration could be explained by Dr. Caillier's diagnosis of a somatoform disorder. Finally, she argues that the ALJ erred by finding that her participation in two social outings was inconsistent with the social isolation she experienced as a result of her depression and anxiety disorders.

In assessing a claimant's credibility, the ALJ must consider several factors, including the claimant's daily activities, the degree of her pain or intensity of her symptoms, aggravating factors, medications, and treatment. 20 C.F.R. § 404.1529(c); S.S.R. 96-7p. The ALJ is required to support his finding with specific reasons, see *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009), and we defer to that determination unless it is found "patently wrong," see *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). An ALJ may not ignore a claimant's subjective reports of pain or mental impairments simply because they are not fully supported by objective medical evidence, but discrepancies between objective evidence and self-reports may suggest symptom exaggeration. See *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005).

Seamon's point about the ALJ's error with respect to her social outings is well taken. Nevertheless, taken alone, this is not enough to support reversal. It is true that an ALJ must consider whether any noted symptom exaggeration could reasonably be attributed to a claimant's diagnosed somatoform disorder. See *Carradine v. Barnhart*, 360 F.3d 751, 754-55 (7th Cir. 2004). But in this case the ALJ properly gave Dr. Caillier's somatoform diagnosis limited weight because he was a non-treating physician and his diagnosis, which was not

made until December 2006, was of little relevance to the observations of symptom exaggeration made years earlier by the treating physicians. In addition, although Seamon suggests that her mistrust of doctors may have prevented her from seeking treatment, the evidence that she restarted treatment with a new psychiatrist days after leaving Dr. Bartholow and Phillips contradicts her claim. Overall the ALJ's credibility determination reflects a careful consideration of Seamon's medical records and thus deserves deference.

We AFFIRM the judgment of the district court.