NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued February 27, 2018
Decided April 18, 2018

**Before**

DIANE P. WOOD, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

No. 17-1601

| | |
|---|---|
| KATHY L. THOMPSON, <br>     *Plaintiff-Appellant*, | Appeal from the United States <br> District Court for the Northern District <br> of Indiana, Fort Wayne Division. |
| *v.* | No. 1:15-CV-295-TLS |
| NANCY A. BERRYHILL, <br> Acting Commissioner of Social Security, <br>     *Defendant-Appellee*. | Theresa L. Springmann, <br> *Chief Judge*. |

**O R D E R**

Kathy Thompson applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), claiming disability based on maladies including degenerative arthritis in her right knee, surgically related bilateral ankle pain and instability, obesity, diabetes, depression, and panic attacks. After two earlier remands ordered by the district court and the Appeals Council, an Administrative Law Judge found Thompson's mental impairments nonsevere and some of her physical impairments severe but not disabling. The Appeals Council denied review, and the district court upheld the ALJ's decision. We conclude that the ALJ again failed to support his decision with substantial evidence, and so we must once more vacate the judgment and remand the case to the Social Security Administration.

**I**

The ALJ found that Thompson was disabled after March 13, 2008, when she turned 50 and her age category changed, and so we limit our discussion to the period before that date. The case is now focused on the period from December 20, 1998 (her alleged onset date) to March 2008. The issue is whether she is entitled to both disability benefits and SSI benefits for those years. Her date last insured, for purposes of disability benefits, was December 31, 2005. Because the case was last remanded for a fresh look at Thompson's mental-health impairments, the parties limit their discussion to that issue, as do we.

Thompson alleges that she has been disabled since December 1998. She has only a ninth-grade education. For about 16 years, she worked as a warehouse laborer, primarily operating a forklift, but after repeated surgical procedures on her foot and ankle, she was unable to return to work because she could no longer stand for long periods and "was having family problems." She also reported that "she missed too many days of work due to health problems and symptoms of depression." Thompson attempted to rejoin the workforce in 2001, but she was unsuccessful.

The first mental-health evidence in the record is from January 1999, when Thompson's primary-care physician, Dr. Daniel Edquist, noted that he was "suspicious that she may well be somewhat depressed with her other symptoms including fatigue, irritability as well as her increased headaches" and that he "would consider trying a serotonin reuptake inhibitor" should a new medication that he prescribed not help her headaches. At her next appointment in February, Thompson admitted there were "some stresses at home" and that her husband had noticed that she was "more irritable and cranky." Dr. Edquist prescribed Paxil for her—a drug that treats, among other things, anxiety and depression.

The following month Thompson reported some improvement on Paxil, but Dr. Edquist again took note of "[p]robable depressive symptoms." Thompson next saw Dr. Edquist in May 1999. At that time, he increased her dosage of Paxil, even though he observed that she was less irritable and did not seem to have the "panic type symptoms" she previously had. In August Dr. Edquist said that Thompson had been under some stress but that her panic attacks were well controlled on Paxil.

As of January 2000, Thompson was still taking Paxil. She saw Dr. Edquist in September 2000 for knee pain, but he noted nothing one way or the other about her

mental health. There is no record of Thompson's seeing Dr. Edquist again until November 2001, but in the meantime she pursued therapy because her daughter's psychologist thought that she needed "services for her depression so as to be able to maintain parenting."

At Thompson's August 2001 intake appointment, her therapist, Betsy Klaus, diagnosed her with Major Depressive Disorder, Single Episode, Moderate, see AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 370 (4th ed., Text Rev. 2000). Thompson told her therapist that she had received inpatient psychiatric treatment for three weeks in 1991. She had been discharged with a prescription for Prozac, but she did not take it. Klaus recorded that Thompson's symptoms included increasing crying, rumination, isolation, and appetite, and a decrease in sleep. Klaus also noted that Thompson had a minimal support system, was unemployed and struggled to pay her bills, and that her daughter had significant psychological problems. Klaus included notes from an interview with Thompson's previous family therapist, Dr. Miller, who wrote that Thompson gets overwhelmed, struggles with depression, has a hard time asking for help, and is fairly isolated.

Thompson continued to see Klaus nearly every week through the end of March 2002. In October she reported that she was trying "to make changes from depressive isolation." Two weeks later, Klaus noted that Thompson was "bright and cheerful." In November, Thompson reported "feeling down" and that she was having problems with her daughter's behavior with more conflict in the prior two weeks. This time Klaus recorded that Thompson was "self-blaming and overwhelmed." Thompson saw Klaus again less than a week later and described feeling more depressed. She cried because "she no longer kn[ew] what brought her joy" and "[o]ld hobbies and activities no longer fit." Thompson's depression worsened at the end of November. At her therapy appointment she appeared tearful and expressed an inability to forgive herself for actions in her past.

The following day, Thompson returned to Dr. Edquist. Near the end of her appointment Thompson told Dr. Edquist that "she had been seeing a counselor at the Madison Center who recommended she take antidepressants" and that "she has been under a lot of stress with her daughter's bipolar illness and she has been having counseling herself in the past year in regards to this." He started her on a new antidepressant, Celexa. Thompson described feeling a little better at her next therapy appointment.

Dr. Edquist again saw Thompson in January 2002 to follow up on her symptoms of anxiety and depression. Although Thompson was still having some panic attacks and anxiety issues, she was doing "quite a bit better." She visited Klaus the same day and reported that she felt hopeful and noticed improvement on her new medication.

In February 2002, Thompson continued to meet with Klaus. She described herself as having good weeks and bad weeks. For example, during one session, Thompson said that she had made small attempts to change behaviors that contributed to her depression. But the following week Thompson reported having a stressful week because her daughter was suspended from school.

The next month Thompson reported improvement, yet at the same time she was seeking social support and going through bankruptcy. Thompson stopped her therapy at the end of March 2002 after 19 sessions. The discharge summary said that her depression had improved. Though Klaus said the treatment was "partially" successful, she also checked a box indicating that the reason for discharge was "[p]atient perceives treatment goals met."

There is no record of Thompson's seeing Dr. Edquist for more than a year after January 2002. (Thompson was uninsured during this time, waiting to qualify for Medicaid.) Thompson saw another member of Dr. Edquist's medical group in September 2002, but other than mentioning her headaches (which Dr. Edquist had correlated with her depression in an earlier record) there is no mention of mental-health concerns. As of October 2003, it does not appear that Thompson was still taking her antidepressant. In January 2004, Dr. Edquist diagnosed her with depression again after she complained of being irritable and cranky, and having sleep disturbances and concentration difficulties. He prescribed a new antidepressant, Lexapro. Three months later, Dr. Edquist's note said that she was taking Celexa again and that her depression was controlled on that medication. The following month she again was experiencing symptoms of depression and anxiety, and so Dr. Edquist increased the dosage.

Thompson went back to Dr. Edquist in June to follow up about her depression and anxiety. She said that she was still irritable but she did not want to increase her dosage or change her prescription. In September 2004, after a hospitalization for chest pain, Thompson had a checkup with Dr. Edquist, who noted that Thompson (still) suffered from panic attacks and that she was on the same dosage of medicine.

In January 2005 Thompson saw Dr. Edquist because she felt fatigued. Dr. Edquist noted that there were stressors at play, such as her separation from her husband, and that she was probably suffering from depression and anxiety. He added that he was willing to send her to get a sleep study but thought that her fatigue was more likely a result of "her current lifestyle, her weight issues and her stressors." Dr. Edquist offered to refer her to counseling at the Madison Center again, but Thompson demurred.

In March 2005, Dr. R. Klion, a state-agency psychologist, reviewed Thompson's medical records and concluded that her mental impairments were not severe. He found that she had a history of depression, along with headaches and knee pain. Dr. Klion rated Thompson as mildly restricted in her activities of daily living, but without functional limitations in maintaining social functioning or concentration, persistence, or pace. Dr. Klion noted that Thompson "states she was seen for depression in 2002" but that she "is able to maintain a reg[ular] routine if feeling bad, or having headaches, but at a slower pace." He then opined that Thompson's mental state appeared to be a result of physical and financial problems.

In May 2005, Thompson visited Dr. Edquist for a physical disability evaluation. Other than noting that she still took Celexa, Dr. Edquist did not refer to depression or anxiety. But in an August treatment note, Dr. Edquist again added depression to her diagnoses and explained that Thompson had increased stressors as she was worried about her daughter who was in an inpatient mental health facility receiving treatment for bipolar disorder. He also listed depression as a problem after a December appointment.

Thompson filled out her own disability report in March 2006. She said that she suffers from panic attacks and depression, that she stopped working because she missed too many days because of her depression, and that she leaves her house only once a week.

In April 2006, Thompson's sister, Constance Kamradt, completed a third-party function report. Kamradt said she spent time with Thompson one day every couple of weeks. Kamradt noted that before Thompson's medical problems began, she worked full-time, cooked, cleaned, shopped, and worked outside. At the time Kamradt filled out the report, Thompson did not need reminders to take medications or take care of personal grooming. But Thompson struggled to spend more than five minutes making food, leading her to subsist on sandwiches and frozen dinners. "Anything more needs help," said Kamradt. Daily, Thompson spent 15 to 20 minutes completing chores such

as tidying and doing the dishes. Kamradt wrote that Thompson rarely went outside apart from shopping for food for 30 minutes each week or going to doctors' offices and that Thompson's only hobby was watching television all day. Although Kamradt checked "yes" in response to a question asking whether Thompson spends time with others, she added "not often."

Kamradt circled answers reflecting that Thompson's conditions affected her concentration and her ability to complete tasks. Kamradt checked the "yes" box in response to the question whether Thompson finished what she started and said Thompson did "fine" following written and spoken instructions. Kamradt wrote that Thompson responded to stress with "panic attacks" and "depression," but later wrote "goes with the flow" when asked how well Thompson handles changes in routine. Last, Kamradt said that she had noticed unusual behaviors and fears in Thompson, including fears of falling, holding others back, and being on her feet (and thus causing swelling and pain).

Later that month, Dr. Nancy Link, a state-agency psychologist, examined Thompson and reviewed her medical records. Dr. Link diagnosed Thompson with Panic Disorder with Agoraphobia and Depressive Disorder Not Otherwise Specified. Dr. Link's report states that Thompson "is anxious being in places where escape might be difficult and avoids these places as a result." Dr. Link concluded that Thompson "displays some periods of depressed mood" and "suffers from some symptoms of depression including depressed mood, fatigue, difficulty concentrating, and little interest in pleasurable activities." She opined that Thompson's mood and affect were depressed and anxious. Thompson reported a past suicide attempt. Thompson maintained periods of attention for less than 15 minutes, had fair concentration, and completed all tasks. Dr. Link found Thompson "to be functioning at a moderate level of impaired in terms of work related activities in respect to her overall level of functioning."

Two days later, a state-agency psychologist, Dr. William Shipley, reviewed the medical record and opined that Thompson's impairments were not severe. Dr. Shipley agreed with Dr. Link's diagnoses of Panic Disorder with Agoraphobia and Depressive Disorder Not Otherwise Specified. He assessed Thompson's functional limitations (restrictions of activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace) as mild and noted that Thompson did not have any episodes of decompensation. Dr. Shipley said that Dr. Link "did not give any medical opinions in regard to functional limitations." This is

correct insofar as Dr. Link did not specifically address restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. It is, however, an overstatement, because Dr. Link did opine more generally that Thompson was moderately impaired "in terms of work related activities" and "in respect to her overall level of functioning." Dr. Shipley also noted that no other medical opinion was on file. He assessed Thompson as "capable of understanding, remembering, and carrying out simple instructions." He thought that she could pay attention to a task for extended periods based on her "activities" and that she could maintain a normal pace and schedule. Finally, Dr. Shipley regarded Thompson's activities of daily living as inconsistent with the social-functioning limitations that she and her sister had described, especially the panic attacks.

In his notes from the five appointments between July 2006 and May 2007, Dr. Edquist mentioned that Thompson had a history of depression that was stable with Celexa, but otherwise did not mention her depression. There are no other medical records from Dr. Edquist after this time.

## II

Thompson first applied for benefits in 2004, claiming disability since 1998. Since then, her case has wound its way through the Social Security Administration and the courts for over thirteen years. In the most recent remand from the district court (by the parties' agreement), the Appeals Council ordered the ALJ to hold a new hearing to reevaluate the severity of Thompson's mental impairments and reassess her mental residual functional capacity.

At her most recent hearing in August 2014 (her third), which focused on the period from 1998 to 2008, Thompson, her daughter (Tracey Rosales), and a vocational expert testified. Thompson testified that she takes medication but that she does not like to go out in public because she is afraid of falling and "all kinds of things." She feels depressed when she goes outside since her legs always hurt, she gets irritable, and she wants to go home. Thompson also described being tired all of the time, and said that she has "always been fatigued." She took a two or three hour nap each day. Thompson also discussed having problems concentrating. She said that she has problems staying on task and that she gets distracted. Thompson described having good and bad days with her depression. During the relevant time period she had three good days each week; on the bad days, she stayed in bed nearly all day.

On the topic of Thompson's concentration, Rosales said that her mother struggled even to sit through a movie at home and that she failed to complete jobs that she started. She too reported that during the relevant period, her mother had about four bad days each week.

The vocational expert (VE) testified that Thompson could not perform her past work given the residual functional capacity described by the ALJ, which included limitations caused by physical, but not mental, impairments, but that she could work as an addresser, a document preparer, or a charge-account clerk. The VE further opined that if, in addition to the physical restrictions, Thompson could not engage in complex or detailed tasks but remained capable of performing simple, routine tasks, those jobs still would be available to Thompson. The VE conceded, however, that Thompson is unemployable with the limitations that she reported, namely, having trouble concentrating, staying on task, getting distracted easily, and taking daily naps. The VE acknowledged that a worker consistently off task for more than ten percent of the work day or one that has constantly to be redirected to a work task is not capable of full-time work. Additionally, the VE stated that a worker who misses two to three days of work per month or more than twelve days in a year (in addition to any excused sick or personal days) would not be able to obtain full-time work. Last, the VE acknowledged that Thompson's daily naps would eliminate employment.

In his written decision the ALJ applied the standard multistep analysis, see 20 C.F.R. §§ 404.1520(a), 416.920(a), and concluded that Thompson was not disabled. As relevant here, the ALJ concluded that Thompson's degenerative arthritis of the knee, bilateral ankle pain and instability, and obesity were severe but that her mental impairments—depression and anxiety/panic disorder—were not. The ALJ concluded that these mental impairments, individually or in combination, did not meet a listing for presumptive disability; that Thompson could perform sedentary work with several physical restrictions; and that Thompson could perform jobs that exist in significant numbers in the national economy and, therefore, was not disabled.

In explaining his decision, the ALJ found Thompson's "statements concerning the intensity, persistence and limiting effects of these symptoms [] not entirely credible." He completely discarded Thompson's and her daughter's testimony about spending two to four days per week in bed since 1998 with the brief comments that it "is not found to be credible" and "[s]urely, if the claimant were that limited, she would have sought more mental health treatment than she did, and her sister would have reported her frequent inability to get out of bed when she completed her function

report." Although the ALJ did not make an express credibility determination for Kamradt, he seems to have found her report at least partially credible, since he used it to contradict certain statements by other witnesses. As to the weight of the psychologists' opinions, the ALJ gave Dr. Link's report "no significant weight," and the state reviewing psychologists "great weight."

Notably, the ALJ's decision largely echoes (and often incorporates by reference) his previous one, which he had been directed to reconsider in light of Thompson's mental impairments and Dr. Link's opinion in particular. The ALJ expressed borderline hostility to this instruction, remarking that "[i]n the 2010 decision, the undersigned addressed this issue extensively and will do so again here." The final opinion is essentially identical to his 2010 decision.

### III

Because the Appeals Council denied review, we evaluate the ALJ's decision as the final word of the Commissioner. *Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). Thompson argues that the ALJ erred by not finding her mental impairments "severe" at Step 2, and by setting only minimal residual functional capacity limitations, because he discredited the examining psychologist's opinion for multiple improper reasons. Our review of the record convinces us that Thompson is correct: the ALJ's decision is not supported by substantial evidence. See *Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016); *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008.)

Thompson first argues that the ALJ erred in discounting Dr. Link's assessment of her mental impairments. The ALJ thought that Dr. Link's view was inconsistent with her sister's report of Thompson's activities of daily living. But it was not. Kamradt's description is entirely consistent with Dr. Link's diagnosis of moderate impairment based on Panic Disorder with Agoraphobia and Depressive Disorder Not Otherwise Specified. Agoraphobia is defined as "anxiety about being in places or situations from which escape might be difficult" and "typically leads to a pervasive avoidance of a variety of situations" such as "being alone outside the home or being home alone; being in a crowd of people; travelling in an automobile." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 432 (4th ed., Text Rev. 2000). "Some individuals are able to expose themselves to the feared situations, but endure these experiences with considerable dread." *Id.* Avoiding anxiety-inducing experiences may impair a person's "ability to travel to work or to carry out homemaking responsibilities (*e.g.*, grocery shopping, taking children to the doctor)." *Id.* In fact, Kamradt's report

corroborates Dr. Link's diagnosis because she said that Thompson pervasively avoided leaving the house and instead "stays home all the time," limiting her grocery trips to 30 minutes—all consistent with agoraphobia. Thompson's occasional forays into society are not inconsistent with these fears. See *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010).

Thompson next argues that the ALJ cherry-picked Kamradt's report, pointing out only evidence that supports no more than mild functional limitations. An ALJ may not highlight some information, while ignoring other evidence. See *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). That is just what the ALJ did here in selectively summarizing Kamradt's report and then using that summary to discredit Dr. Link. For example, the ALJ noted that Kamradt reported that "the claimant fixes simple foods, picks up at home, does dishes, and shops for food weekly." But the ALJ ignored the qualifications Kamradt put on those statements. For example, Kamradt said that Thompson required help if spending *anything more than 5 minutes* preparing food. She made *sandwiches* and *frozen dinners*. And Kamradt said that Thompson spent only *15 to 20 minutes* doing chores each day. The ALJ is correct that Thompson completed weekly grocery shopping, but he skipped over the fact that she spent only *30 minutes* shopping in a week. The ALJ said that Thompson "has no problem getting along with family, friends or others, but stays home all the time." This is not an accurate depiction of Kamradt's testimony. Kamradt stressed that Thompson did not often spend time with others (even if she had no problem "getting along" with them), and Kamradt repeatedly emphasized that Thompson went nowhere on a regular basis, which is consistent with panic disorder with agoraphobia. In short, Kamradt's report is not consistent with Thompson's engaging in "a broad range of activities."

Regarding Thompson's ability to concentrate, the ALJ merely recited the information on one page of Kamradt's report ("that the claimant has no problem paying attention, can follow written and spoken instructions, and finishes tasks that she starts") and ignored that on the previous page, Thompson's sister circled "Concentration" and "Completing Tasks" as abilities that were inhibited by Thompson's illness.

The ALJ dismissed Dr. Link's report as "not worthy of great weight" because it purportedly was based on Thompson's subjective complaints and was not "independently verified." But any psychological examination could be said to suffer from this criticism, and this statement ignores the professional status and judgment of the psychologist. By refusing to confront Dr. Link's professional assessment, the ALJ failed to meet his obligation to weigh all of the medical evidence.

We add that Dr. Link's report was not based merely on a subjective report by Thompson. Dr. Link completed an objective assessment of Thompson's mental functioning by asking Thompson to answer questions with concrete answers, such as math calculations. And Dr. Link wrote that "Ms. Thompson admitted to suicidal ideation and intent in the past." Had Dr. Link—again, an agency consultant—believed that Thompson was dissembling rather than accurately reporting her symptoms, surely the doctor would have said so.

Second, the ALJ's statement is inconsistent with the rule that opinions derived from subjective reports are not automatically suspect. See *Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015) (noting that giving subjective statements zero weight is fundamental error). As Thompson argues, to discount Dr. Link's evaluation merely because it was "based on the claimant's subjective report of symptoms" ignores that the subjective report is not simply transcribed: it is filtered through the psychologist's training and judgment. See *Price v. Colvin*, 794 F.3d 836, 839–40 (7th Cir. 2015) (psychiatrist); *Adaire*, 778 F.3d at 688 (psychologist). Like a medical doctor evaluating physical pain, a psychologist must start with the patient's description of her own experience; this is not a defect. Subjective complaints are nevertheless assessed according to the profession's objective criteria; what the psychologist puts out is not a simple transcription of the patient's self-report. It appears that the real basis the ALJ had for ignoring Dr. Link's analysis is that he discredited *Thompson*'s reports of her symptoms; he therefore inappropriately substituted his own view of Thompson's mental impairments for Dr. Link's. See *Meuser*, 838 F.3d at 911.

Thompson next rightly criticizes the ALJ for using a semantic trick to disregard Dr. Link's opinion that Thompson was "functioning at a moderate level of impaired in terms of work related activities in respect to her overall level of functioning." The ALJ faulted Dr. Link for failing to define the term "moderate" and for using a definition that the ALJ thought (without any basis) was probably not the same as the one used by the Social Security Administration. But this is not a reasonable conclusion. Dr. Link is an agency consultative examiner and likely familiar with the terms of art the agency uses. And even if Dr. Link used "moderate" in a nontechnical way, the ALJ had no basis for assuming that he (alone) knew that she really meant "mild" or some other less-than-disabling adjective.

The ALJ also erred by discounting Dr. Link's opinion in favor of the nonexamining state-agency psychologists, Dr. Klion and Dr. Shipley. We have said that

"rejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled … can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). Generally "a contradictory opinion of a non-examining physician does not, by itself, suffice" to reject "an examining physician's opinion." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Dr. Link characterized Thompson's "difficulty in her customary activities and daily living skills" as "moderate," and her level of impairment "in terms of work related activities" also as "moderate." Dr. Klion and Dr. Shipley rated Thompson's functional limitations to be mild or nonexistent. The ALJ does not explain *why* the nonexamining state psychologists are entitled to greater weight other than by saying that their reports are "consistent with the function reports in the record, which show that the claimant engages in a broad array of daily activities, gets along with people, leaves her home for shopping and appointments, and is capable of sustained concentration." We have already explained why those conclusions are not supported by the record.

Accordingly, we **VACATE** the decision upholding the ALJ's denial of benefits and **REMAND** to the agency for further proceedings. We encourage the agency to assign Thompson's file to a new ALJ, both because of the hostility the current ALJ has shown to previous remands and because of the benefit of a fresh perspective.