In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1045

LOTRESIA TERRY,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE, Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 07-C-969—**Rudolph T. Randa**, *Chief Judge.*

ARGUED JULY 8, 2009—DECIDED AUGUST 28, 2009

Before ROVNER, WOOD and WILLIAMS, *Circuit Judges.*

PER CURIAM. Lotresia Terry applied for Disability Insurance Benefits, asserting that she cannot work because she suffers from depression, fibromyalgia, hypertension, pelvic floor disorder, hematuria, and severe back pain following spinal fusion surgery. After her claim was administratively denied, an administrative law judge ("ALJ") reviewed her claim and concluded that Terry's

impairments did not render her disabled. The Social Security Appeals Council denied her request for review and the district court held that the ALJ's decision was supported by substantial evidence. Terry appeals. Because the ALJ relied on an unsigned medical report that should have been excluded from the record, failed to consider all of Terry's impairments, and erroneously found her not credible, we remand the case to the agency.

**Background**

Terry, who was forty-one years old at the time of the ALJ's decision, was diagnosed with fibromyalgia in 2001 and depression in 2004. Despite these impairments, she continued to work as a certified nurse's assistant until the fall of 2004, when an MRI of her spine revealed degenerative disc disease. In early 2005, Terry had spinal fusion surgery to address her chronic back pain. On February 7, 2005, she was discharged from occupational therapy as "independent in all self-cares" so long as she wore a back brace and a "sock aide," used a walker, and received assistance from her husband. During the spring of 2005, she received follow-up CT scans of her spine, which showed that she was recovering from surgery normally and that her spine fusion was stable. Terry was also diagnosed with pelvic floor disorder, hematuria (blood in her urine), and urgency of urination; although initially her urologist recommended that she pursue "intense and aggressive treatment of her pelvic floor musculature," by May 2005, a physician's assistant had noted that these conditions were improving and that this was her fifth and final visit to the doctor.

In June 2005, Terry applied for disability insurance benefits and supplemental security income, claiming an onset date of November 15, 2004. As part of the application process, a state agency doctor reviewed her medical records in August 2005 and concluded that she could perform light work. Several months later, another state agency physician, Dr. Daniel Jankins, examined Terry and observed that, although she reported needing a walker, she had intact reflexes, no swelling, and excellent muscle tone in her legs. Jankins noted that he had "somewhat of a difficult time explaining why she needs the walker" and recommended an orthopedic evaluation. Jankins also observed that Terry reported significant pain associated with fibromyalgia and back surgery, and noted her positive straight leg raising test and limited range of motion in her spine and hips. Finally, Jankins reported that, although in 2004 Terry had been prescribed Zoloft to treat her depression, she had stopped taking the drug after one month.

On March 10, 2006, Terry's treating physician, Dr. Benjamin Tobin, completed a residual functional capacity ("RFC") evaluation focusing on her fibromyalgia. Tobin opined that she could not walk more than one city block, lift ten pounds or more, or sit or stand for more than five minutes without changing position. He also reported that she could sit for two hours and walk for two hours during an eight-hour workday so long as she had the option of shifting positions, keeping her legs elevated while sitting, and taking unscheduled breaks. Tobin concluded that Terry would likely miss work more than four times a month because her illnesses produced "good days and bad days." He reported that, in addition

to fibromyalgia, Terry had been diagnosed with degenerative disc disease, hypertension, chronic sinusitis, restless leg syndrome, depression, and psycho-physiological pain. Treatment notes submitted by Tobin show that Terry was prescribed Zoloft off and on beginning in 2004 and was consistently prescribed Paxil, another drug used to treat depression as well as anxiety, throughout 2004, 2005, and 2006.

In February 2006, Terry had another CT scan that was positive for a possible nonunion at disc L5-1. Her treating surgeon, Dr. Shekar Kurpad, met with her in May 2006 to discuss the scan and her continuing back pain. Dr. Kurpad recommended waiting three months and, if her pain had not abated, considering a second spinal fusion surgery at that point. When Terry returned to Dr. Kurpad in August 2006, x-rays showed that she had healed "extremely well" from the surgery, but Kurpad could not tell whether the x-ray showed a second nonunion. He again recommended waiting six months to see if her pain decreased before scheduling a second surgery.

In December 2006, Terry was examined by an orthopedist, Dr. Sean Tracy, at the request of the state agency. Tracy concluded that she had no orthopedic issues and could lift and carry less than ten pounds, stand and walk less than two hours in an eight-hour workday, and sit less than six hours in an eight-hour workday. Because Terry told him that her treating physician had recommended a second back surgery, Tracy instructed her to avoid heavy bending, lifting, pulling, or twisting until she could see her doctor again.

That same month Terry also underwent a psychological evaluation at the request of the state agency. Dr. Phillip Ruppert opined that, although Terry reported suffering from depression and taking Zoloft, he believed that she might have been exaggerating the degree of impairment she experienced. Ruppert noted that she was able to understand, remember, and carry out simple instructions, and her capacity to maintain concentration and pace was between fair and good. He concluded that Terry suffered from "depression, not otherwise specified."

The record also contains an unsigned, undated RFC form from the state agency which concluded that Terry could perform work at the sedentary level. The RFC form states that Terry could occasionally lift ten pounds, frequently lift less than ten pounds, stand or walk at least two hours in an eight-hour workday, and sit for six hours in an eight-hour workday.

At a hearing before an ALJ, Terry testified that she lived with her aunt, who performed most daily tasks for her because her pain prevented her from doing household chores. She explained that, because of her fibromyalgia and back pain, she experienced "burning and throbbing" pain all over. On most days, she reported a pain level of ten out of ten. She also described her symptoms of depression, explaining that she cried frequently, avoided people, and only left the house when she had a doctor's appointment.

A vocational expert ("VE"), Allen Searles, also testified. The ALJ asked Searles to assume that Terry was limited to sedentary, unskilled work and would have to stand

for one or two minutes every half hour. Searles opined that, given those limitations, she would not be able to perform her past work as a certified nurse's assistant or home health care aide but would be able to work as a surveillance system monitor (10,570 jobs in Wisconsin), an order clerk (11,260 jobs), or a "callout operator" performing credit checks for mortgage companies (950 jobs). When the ALJ asked him whether someone who was off pace five percent of the time could perform these jobs, Searles replied yes, but cautioned that someone who was off pace ten percent of the time or who was absent more than two days per month would not be able to find work. The ALJ then, apparently as an intended joke, asked Searle, "And I suppose if she arrived at work in a body bag that wouldn't be good either?" When Searle replied, "No," the ALJ continued, "Yeah, we call these the dead claimant RFCs." The ALJ also asked Terry's counsel, "What's my job here, you know, write checks?"

After considering all the evidence, the ALJ concluded that Terry was not disabled. In so finding, the ALJ applied the five-step analysis described in 20 C.F.R. § 404.1520(a)(4)(i)-(v). He found that although Terry had previously worked as a certified nurse's assistant, she had not engaged in substantial gainful employment since the alleged onset of her disability. The ALJ next found that her fibromyalgia, depression, and post-surgical changes to her spine constituted severe impairments, but that those impairments did not qualify as any listed impairment. The ALJ chose not to credit Terry's testimony regarding the disabling effects of her pain and depression because her reports were inconsistent and

uncorroborated by the medical record. He also reasoned that Dr. Tobin's assessment of her limitations relied heavily on her subjective reports and was contradicted by the state agency reports. Relying heavily on the unsigned state agency form, the ALJ concluded that Terry retained the residual functional capacity to perform "simple, unskilled work at the sedentary exertional level with the option to stand for one to two minutes every one-half hour." The ALJ reasoned that these limitations prevented her from returning to her past work, but concluded that because there were other jobs that she could perform with these restrictions, she was not disabled.

Unhappy with the ALJ's decision, Terry asked the Appeals Council to reconsider the Commissioner's determination in light of new evidence documenting her treatment for depression during the spring of 2007. The Appeals Council denied the request, however, making the ALJ's ruling the Commissioner's final decision. Terry next turned to federal district court, but the district judge concluded that the ALJ's decision was supported by substantial evidence.

## Analysis

We review the ALJ's decision deferentially, upholding it if it is supported by substantial evidence. *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007). Substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* at 841 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The ALJ is not required to address every

piece of evidence or testimony presented, but must provide a "logical bridge" between the evidence and his conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). We view the record as a whole but do not reweigh the evidence or substitute our judgment for that of the ALJ. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

Terry first argues that the ALJ's RFC determination is unsupported by substantial evidence because he was not entitled to rely on an unsigned, undated medical opinion. And, continues Terry, once the unsigned report is set aside, no other evidence supports the ALJ's conclusion that she could perform sedentary work.[1] Although Terry does not cite it, 20 C.F.R. § 404.1519o provides that an unsigned examination report may not be used to deny benefits.[2] The reason for this is that the signature verifies

---

[1] "Sedentary work" is defined as involving lifting no more than ten pounds at a time and occasionally carrying articles such as docket files, ledgers, and small tools. *Haynes v. Barnhart,* 416 F.3d 621, 627 n.2 (7th Cir. 2005) (citing SSR 83-10). In addition, walking and standing are required only occasionally (no more than two hours in an eight-hour workday). *Id.*

[2] "We will not use an unsigned or improperly signed consultative examination report to make [a decision to deny benefits]. When we need a properly signed consultative examination report to make these determinations or decisions, we must obtain such a report. If the signature of the medical source who performed the original examination cannot be obtained because the medical source is out of the country for an extended period of time, or on an extended vacation, seriously

(continued...)

that "the medical source doing the examination or testing is solely responsible for the report contents and for the conclusions, explanations or comments provided with respect to the history, examination and evaluation of laboratory test results." 20 C.F.R. § 404.1519n(e). An agency is bound by its own regulations. *See Allen v. Comm'r of Soc. Sec.,* 561 F.3d 646, 651 (6th Cir. 2009); *Dugan v. Sullivan,* 957 F.2d 1384, 1388 n.5 (7th Cir. 1992).

Moreover, the ALJ's reliance on the unsigned opinion was not harmless error. None of the other doctors stated that Terry was capable of sedentary work. Dr. Jankins apparently did not render an opinion on her ability to work, while Dr. Tobin's evaluation suggests that she is incapable of any work at all. Dr. Tracy also did not comment on whether Terry could perform sedentary work, but did note some restrictions that might limit her capacity to do so, including the facts that she could lift less than ten pounds, sit for less than six hours, and stand or walk for less than two hours. And although another state agency doctor concluded that Terry could perform light work, the ALJ did not discuss this opinion at all or resolve the conflict between it and the opinions of the other physicians. The ALJ's decision makes it clear that the unsigned report carried significant weight:

> In reaching this conclusion regarding the claimant's residual functional capacity, the undersigned has also

---

[2] (...continued)
ill, deceased, or for any other reason, the consultative examination will be rescheduled with another medical source." 20 C.F.R. § 404.1519o.

> considered the opinions of the State Agency medical consultants who evaluated this issue . . . . In Exhibit 4F [the unsigned opinion], the State Agency medical consultants determined that the claimant could perform work at the sedentary exertional level with exertional limitations. . . . [B]ased on the reasons set forth in the text of this decision, the undersigned concurs with the State Agency's overall conclusion that the claimant can perform sedentary work.

If we exclude the unsigned report from the record, we cannot identify any evidence the ALJ could have relied on to conclude that Terry could perform sedentary work. The agency responds that we may infer that a physician who signed the state agency's reconsideration determination authored the unsigned opinion, but this is pure conjecture. There is nothing in the record itself that suggests the report is authored by a physician at all, let alone the specific doctor proposed by the government. More importantly, the agency seems to be unaware of 20 C.F.R. § 404.1519o's signature requirement. An unsigned medical evaluation cannot be the kind of substantial evidence we would need to uphold the ALJ's RFC determination, and so this issue requires remand to the agency.

Some of Terry's other arguments warrant remand as well. Terry argues that the ALJ did not consider the impact on her functional limitations of her pelvic floor disorder, urinary urgency, and hematuria. Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence

that is contrary to the ruling. *See Villano v. Astrue,* 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004). Notably, the ALJ's opinion does not even mention Terry's pelvic floor and urinary disorders, impairments that must be considered to determine whether an applicant is disabled. *See Golembiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir. 2003) (citing *Crowley v. Apfel,* 197 F.3d 194, 198-99 & n.17 (5th Cir. 1999) (collecting cases)). Although these impairments may not on their own be disabling, that would only justify discounting their severity, not ignoring them altogether. Moreover, we have frequently reminded the agency that an ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation. *Villano,* 556 F.3d at 563; *Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir. 2008); *Golembiewski,* 322 F.3d at 918 (citing 20 C.F.R. § 404.1523).

The government notes that there are no records from Terry's urologist after 2005, and asks us to conclude from this that her urinary and pelvic floor problems have been cured. However, the record is silent on this point, and it was the ALJ's obligation to develop the record. *See Nelms v. Astrue,* 553 F.3d 1093, 1098 (7th Cir. 2009); *Barnett v. Barnhart,* 381 F.3d 664, 669 (7th Cir. 2004). Moreover, the ALJ did not reach the conclusion the government urges. Rather, he ignored these diagnoses altogether. On remand, the ALJ should evaluate whether Terry's additional impairments affect her ability to work.

Terry is also correct that the ALJ failed to support his conclusion that her testimony was not credible. Although

we afford an ALJ's credibility finding "considerable deference" and will overturn it only if "patently wrong," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006), the ALJ must consider the claimant's level of pain, medication, treatment, daily activities, and limitations, 20 C.F.R. § 404.1529(c), and must justify the credibility finding with specific reasons supported by the record, *Villano*, 556 F.3d at 562. And here, the ALJ repeatedly mischaracterized the record in identifying purported "inconsistencies" in Terry's testimony. For instance, the ALJ stated that the record contained no evidence of treatment for depression before May 2006, and concluded that Terry's claims of a depression diagnosis before 2006 were an attempt to mislead the agency. But recurring prescriptions for antidepressants appear in Terry's treatment notes beginning in 2004. The ALJ also concluded that Terry's claims of disabling pain were not credible because she had not reported any side effects from her medications. To begin with, we are skeptical that a claimant's failure to identify side effects undermines her credibility—after all, not everyone experiences side effects from a given medication, and some patients may not complain because the benefits of a particular drug outweigh its side effects. But even if we accepted this conclusion, the ALJ was wrong. Terry did tell her physicians that her medications made her drowsy. The ALJ additionally thought that no objective medical evidence supported Terry's report that she might require a second spinal surgery, but her account is corroborated by Dr. Kurpad's notes showing that her CT scans possibly showed another nonunion. Finally, the ALJ placed considerable weight on the fact that

no doctor had prescribed a walker for Terry, concluding that this showed she had exaggerated her symptoms. But given her fibromyalgia and history of back surgery, Terry's use of a walker, even if a doctor did not recommend it, is not on its own enough to make her testimony regarding her pain unbelievable. The ALJ's adverse credibility determination is simply not supported by the record, and so on remand the agency must reassess Terry's credibility in light of all the evidence of record. *See Ribaudo v. Barnhart,* 458 F.3d 580, 584-85 (7th Cir. 2006) (remanding where ALJ's adverse credibility determination was not supported by record); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002) (remanding where ALJ mischaracterized record).

Terry's remaining argument is less persuasive. She contends that the ALJ did not ask the VE if his testimony conflicted with the Dictionary of Occupational Titles ("DOT") as required by Social Security Ruling 00-4p. Terry notes that the jobs listed by the VE require a General Educational Development ("GED") reasoning level of three, which, she says, conflicts with the ALJ's conclusion in his written opinion that she retained the capacity to perform only "simple" work. Under SSR 00-4p, Terry correctly observes, the ALJ has an "affirmative responsibility" to ask if the VE's testimony conflicts with the DOT, and if there is an "apparent conflict," the ALJ must obtain "a reasonable explanation." SSR 00-4p; *see also Overman v. Astrue,* 546 F.3d 456, 462-63 (7th Cir. 2008); *Prochaska,* 454 F.3d at 735.

Terry is correct that the ALJ did not ask the VE if his testimony conflicted with the DOT. However, the error

is harmless unless there actually was a conflict. *See Renfrow v. Astrue,* 496 F.3d 918, 921 (8th Cir. 2007). Here, there was not. A GED reasoning score of three means that the claimant must be able to "apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES, App'x C(III). Tellingly, Terry does not argue that she cannot perform these skills, perhaps because the record suggests she can: she finished high school, completed training to become a certified nurse's assistant, and has the cognitive capacity to follow simple instructions. *See Renfrow,* 496 F.3d at 921 (job requiring level three reasoning was not inconsistent with claimant's ability to follow only simple, concrete instructions).

Moreover, to the extent that there was a conflict, SSR 00-4p requires the ALJ to obtain an explanation only when the conflict between the DOT and the VE's testimony is "apparent." *Overman,* 546 F.3d at 463. Because Terry did not identify any conflict at the hearing, she would have to show that the conflict was "obvious enough that the ALJ should have picked up on [it] without any assistance." *Id.* Terry's educational background and cognitive abilities appear to match the requirements of GED reasoning level three, and so any conflict is not so obvious that the ALJ should have pursued the question.

Finally, we are concerned by the ALJ's inappropriate "jokes" about dead Social Security claimants, which

suggest that he may be incapable of evaluating Terry's case fairly. We therefore urge the Commissioner to transfer the case to a different administrative law judge on remand. *See Golembiewski,* 322 F.3d at 918; *Sarchet v. Chater,* 78 F.3d 305, 309 (7th Cir. 1996).

VACATED AND REMANDED.