NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 17, 2015
Decided December 7, 2015

**Before**

JOEL M. FLAUM, *Circuit Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 15-1254

| | |
|---|---|
| DEBORAH SLAYTON,<br> *Plaintiff-Appellant,* | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 14-cv-117-bbc |
| CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br> *Defendant-Appellee.* | Barbara B. Crabb,<br> *Judge.* |

**ORDER**

Deborah Slayton applied for Disability Insurance Benefits and Supplemental Security Income claiming disability from several impairments. An administrative law judge denied benefits (a decision upheld by the district court). The ALJ found that Slayton was exaggerating the extent of her symptoms and concluded that, in fact, she is able to perform unskilled, light work with certain restrictions. Because the ALJ's credibility assessment is not patently wrong and is supported by substantial evidence, we uphold the denial of benefits.

Slayton applied for benefits in April 2011 alleging an onset date in May 2009. Her date last insured was in September 2009. Slayton identified four impairments affecting her ability to work: hepatitis C; chronic obstructive pulmonary disease; arthritis, causing pain in her shoulders, knees, and elbows; and pain of unspecified origin in her lower back, hip, and tailbone. Before her onset date she had worked sporadically at several jobs, including cleaning and laundry services. The Social Security Administration denied Slayton's application initially in August 2011 and again on reconsideration in May 2012. Her hearing before the ALJ was in July 2013.

Slayton's back pain had begun in 2001. An occupational medical specialist who examined Slayton at that time saw nothing in the results of an MRI explaining the amount of pain she reported. The physician noted "a lot of psychological overlay and overreaction to her pain level."[1] She cleared Slayton to return to work but imposed a few days' restrictions on lifting and bending. The record contains no evidence about what, if any, medical care Slayton sought between this evaluation in 2001 and her next general checkup in 2010.

At that routine checkup in October 2010, Slayton told a nurse practitioner that she was experiencing joint paint, but the provider concluded that Slayton was not in acute distress and did not find any neurologic or musculoskeletal abnormality. Then in February 2011, two months before Slayton applied for benefits, she switched providers. Dr. Robert Nogler, her new personal physician, performed an initial exam and diagnosed degenerative joint disease and a history of "asthma/chronic obstructive pulmonary disease." He prescribed an anti-inflammatory drug and an inhaler.

Although Slayton had not complained about symptoms indicative of hepatitis C, Dr. Nogler referred her to a hematologist because routine blood work had shown an abnormality. Slayton then disclosed to the specialist that she had been diagnosed with hepatitis C in the 1980s but never treated. Lab tests in March 2011 confirmed hepatitis C. Since that time Slayton has not been treated for the condition because her low platelet

---

[1] Psychological overlay, sometimes called functional overlay, refers to subjective experiences of pain that cannot be explained by diagnostic findings. *See, e.g.,* Ron Lechnyr, Ph.D, D.S.W. & Henry H. Holmes, M.D., *Taxonomy of Pain Patient Behavior*, PRACTICAL PAIN MANAGEMENT, December 28, 2011, http://www.practicalpain management.com/treatments/psychological/taxonomy-pain-patient-behavior; *Functional Overlay*, MOSBY'S MEDICAL DICTIONARY (8th ed. 2009).

count would worsen the side effects of medication intended to forestall liver cirrhosis.[2] Her condition was monitored, though, and in March 2012, September 2012, and May 2013 she reported generalized fatigue but no other symptoms. Lab tests in May 2013 showed "evidence of cirrhosis," but Slayton's gastroenterologist simply recommended imaging twice yearly to monitor the situation.

In June 2011 a specialist in physical medicine and rehabilitation, Dr. Eric Carlsen, performed a "Social Security Consultative Exam" at the request of the state agency. He concluded that Slayton probably suffers from osteoarthritis of the knees[3] and lumbar spondylosis.[4] He noted "functional overlay on exam, which might be related to pain or anxiety." He found that her gait was normal, that she had diffuse giveaway weakness[5] but displayed "4/5" muscle strength[6] "with coaxing," and that she could reach overhead

---

[2] Slayton has been advised to take Telaprevir, should her platelet count allow it, to "reduce and prevent cirrhosis-related complications." *See* E. Ogawa, et al., *Telaprevir-Based Triple Therapy for Chronic Hepatitis C Patients With Advanced Fibrosis*, ALIMENT PHARMACOL THER., 2013, at 1076–85, http://www.medscape.com/viewarticle/812834.

[3] Osteoarthritis occurs when protective cartilage on the ends of bones wears down over time. *Osteoarthritis,* STEDMAN'S MEDICAL DISCTIONARY 1282 (27th ed. 2000).

[4] Lumbar spondylosis is not a clinical diagnosis but a general term used to describe any manner of spine degeneration or arthritis. *See Spondylosis: What It Actually Means*, SPINE-HEALTH, http://www.spine-health.com/conditions/lower-back-pain/spondylosis-what-it-actually-means (visited November 25, 2015).

[5] "Giveaway weakness" may be a sign of exaggeration of pain. *See Simila v. Astrue*, 573 F.3d 503, 508 (7th Cir. 2009) (citing MURIEL D. LEZAK ET AL., NEUROPSYCHOLOGICAL ASSESSMENT 326 (4th ed. 2004) ("Neurological examiners repeatedly noted give-away weakness (poor effort on strength testing) indicating that [the patient] was actively preserving a disability status.")).

[6] The Medical Research Council grades muscle strength on a scale of 0 (no movement) to 5 (contracting normally against full resistance). Grade 4 indicates that muscle strength is reduced but muscle contraction can still move the joint against resistance. *See Medical Research Council Scale for Muscle Strength*, MEDICAL CRITERIA,

and do fine finger movements. He acknowledged that Slayton might be unable to perform heavy manual labor or engage in frequent bending, squatting, or stooping. A second state-agency consultant reviewed Slayton's medical records in August 2011 and opined that she could do light work with some restrictions and could perform her past relevant work at a laundry.

The SSA denied benefits soon after receiving these opinions. From then on Slayton reported worsening back pain. In October 2011 she consulted another new physician, rheumatologist Marlon Navarro, and reported a "constant, 8 out of 10 intensity dull ache" that had lasted a week. Dr. Navarro observed that Slayton's gait and her range of motion in the lumbar area were normal, and he noted that the etiology of her back pain was unclear. He prescribed a gel for her lower back. Slayton returned to Navarro later complaining that the pain had not improved; he ordered an X-ray but found nothing significant.

In 2012, while her request for reconsideration was pending, Slayton began seeking treatment for hip and tailbone pain. In March of that year she returned to Dr. Navarro reporting pain in her hips that had persisted for 30 years, and pain in her tailbone that she reported experiencing for the previous 2 years. Navarro reviewed an MRI of Slayton's pelvis and found some trochanteric bursitis.[7] An MRI and an X-ray of the lumbar spine showed some joint degeneration, while X-rays of the pelvis were negative. Navarro injected a steroid into her hips, recommended a donut cushion, and referred Slayton to a pain clinic. The pain clinic performed a ganglion impar block,[8] and Slayton reported a 50% improvement in her pain.

A second state-agency physician reviewed Slayton's medical records in May 2012 and opined that she could perform her past work or other light work with some restrictions. That same month the SSA denied reconsideration of its initial decision.

---

http://www.medicalcriteria.com/site/en/criteria/64-neurology/238-neuromrc.html (visited November 25, 2015).

[7] Trochanteric bursitis is inflammation of the fluid-filled sac near the hip joint. *See Trochanteric Bursitis*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases_conditions/hic_Bursitis/hic_Trochanteric_Bursitis (visited November 25, 2015).

[8] A ganglion impar block is an injection in the tailbone to block nerve endings that cause pain. *See Ganglion Impar Sympathetic Nerve Blocks*, MEDSCAPE, http://emedicine.medscape.com/article/309486-treatment#d11 (visited November 25, 2015).

Afterward, Slayton's complaints of pain and associated treatment expanded further in scope. Days later she returned to Dr. Navarro complaining of severe knee pain, and he injected a steroid into both knees. Then in September 2012 she returned to Dr. Carlsen, whose role had shifted from consultant for the state agency to treating physician. Slayton reported pain and numbness in her right arm, but Carlsen could not find evidence of a problem. Also that month Slayton returned to Navarro complaining of pain in her neck and shoulders and numbness in her hands. He could not explain these symptoms and ordered an MRI of Slayton's spine, which showed two small disc protrusions but no sign of spinal canal degeneration or other abnormality. Navarro recommended an analgesic cream and visits to a physical therapist or pain clinic.

Elbow pain was next. Slayton complained of chronic elbow pain in an April 2013 visit to Dr. Carlsen, who suspected only "medial epicondylitis," known as "golfer's elbow" or "suitcase elbow."[9] Carlsen also observed "functional overlay" possibly linked to "pain, anxiety, or desire for acknowledgment of disability." He noted in the file that Slayton had arrived wearing unnecessary arm braces and that she might be entering "a downward spiral of chronic pain syndrome." Another MRI and X-ray were normal, and Carlsen simply recommended ice and anti-inflammatories for Slayton's elbows.

Slayton continued to report severe shoulder and knee pain in the months leading to her hearing before the ALJ. An MRI in May 2013 identified severe acromioclavicular arthritis[10] in both shoulders. Slayton was referred to orthopedic surgeon Glen Rudolph, who treated her pain with injections in both shoulders. Tests in June 2013 showed a meniscus tear in Slayton's right knee, which required arthroscopic surgery. After that

---

[9] Medial epicondylitis is strain of the muscles from elbow to wrist caused by repetitive or excessively forceful movement such as swinging a golf club or carrying a heavy suitcase. Ceasing the activity that caused the strain and ice or anti-inflammatories are common treatments. *See Medial Epicondylitis (Golfer's and Baseball Elbow),* JOHNS HOPKINS MEDICINE, www.hopkinsmedicine.org/healthlibrary/conditions/orthopaedic_ disorders/medial_epicondylitis_golfers_and_baseball_elbow_85,P00928/ (visited November 25, 2015).

[10] Acromioclavicular arthritis results when the cartilage between the two bones in the shoulder wears away. *See Acromioclavicular (AC) Joint Problems,* JOHNS HOPKINS MEDICINE, http://www.hopkinsmedicine.org/healthlibrary/conditions/orthopaedic_ disorders/acromioclavicular_ac_joint_problems_22,AcromioclavicularJointProblems/ (visited November 25, 2015).

surgery Dr. Navarro concluded that Slayton was healing well and showing stability in all other joints. He did not recommend further treatment.

At the hearing before the ALJ in July 2013, Slayton recounted experiencing debilitating pain. She explained that pain in her tailbone radiates up her back and is lessened only briefly with injections. This pain, as well as knee pain, she continued, prevents her from sitting or standing continuously for more than ten minutes. Slayton said she could walk only about 75 feet because of her knees and shortness of breath, though without someone around to assist she normally does not walk at all. She also asserted that frequently she must lie down for 30 to 45 minutes and estimated that she would need to lie down for 3 out of 8 working hours. Her back pain is so intense, Slayton said, that lifting much at all is difficult and some days she cannot even pour a glass of milk. And neither can she reach forward to grasp objects because her shoulder pain (which radiates to her hands) is so severe that her hands cramp and go numb. Slayton testified that, although she was recovering well from surgery on her right knee, she anticipated needing surgery on the other knee and both shoulders.

Slayton's husband and son submitted letters. Her husband described helping wash her hair and back because lifting her arms is painful. He also said that Slayton must use a scooter when shopping.

A vocational expert testified that Slayton could perform her past work in a laundry or other jobs with the limitations identified by the ALJ. He acknowledged that two or more absences a month would not be tolerated and that no competitive employment would be available to Slayton if her impairments cause her to be off-task for three out of eight hours during the workday.

The ALJ applied the familiar 5-step analysis in finding that Slayton was not disabled. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). At Step 1 the ALJ determined that Slayton had not engaged in substantial gainful activity since her alleged onset date. At Step 2 the ALJ identified Slayton's severe impairments as hepatitis C, chronic obstructive pulmonary disease, knee pain, low back pain, tailbone pain, osteoarthritis in both shoulders, and reduced bone mass. At Step 3 the ALJ concluded that these impairments, individually or in combination, do not satisfy a listing for presumptive disability. Slayton does not dispute any of these conclusions.

At Step 4, in assessing Slayton's residual functional capacity, the ALJ rejected Slayton's account of disabling limitations. Though acknowledging that Slayton's testimony could evidence a greater impairment than suggested by medical evidence, the

ALJ concluded that her account was "only very minimally credible." Apart from the absence of corroborating medical findings, the ALJ noted that Slayton's doctors occasionally had commented that her pain seemed disproportionate to their objective findings. And, the ALJ added, Dr. Carlsen and Dr. Navarro had settled on conservative pain treatment that appeared successful. Slayton's testimony was further undercut, the ALJ reasoned, since she had not told medical providers about some of the symptoms she mentioned when testifying, like shortness of breath and difficulty walking. He gave little weight to the letters from Slayton's husband and son, and noted that Slayton, who was 54 when she applied for benefits, had only a minimal work history in the 7 years before her alleged onset. The ALJ gave significant weight to the opinion of Dr. Carlsen, the state-agency consultant turned treating physician, because he had examined Slayton and was experienced in evaluating medical impairment under the regulations. The ALJ also gave weight to the other state-agency medical consultants but limited Slayton's residual functional capacity even more than they thought necessary.

The ALJ concluded at Step 4 that Slayton still could perform her past work with the limitations he specified. In the alternative, the ALJ concluded at Step 5 that Slayton could also work at other jobs.

The Appeals Council denied review, making the ALJ's decision the final word of the Commissioner. *See Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). In this court Slayton challenges the ALJ's credibility finding. In determining credibility an ALJ must consider factors imposed by regulation, *see* 20 C.F.R. § 404.1529(c), and must support his credibility finding with evidence in the record, *see Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). If the ALJ satisfies these criteria, his credibility determination is reviewed with deference and will stand unless "patently wrong." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013*); Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010).

Slayton argues that the ALJ relied solely—and thus incorrectly—on the lack of objective medical evidence to discount her report of disabling pain. She cites to decisions recognizing that an ALJ may not deny benefits simply because the objective medical evidence falls short of explaining the claimant's reported pain. *See Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015); *Pierce v. Colvin*, 739 F.3d 1046, 1049–50 (7th Cir. 2014).

But the ALJ relied on more than the lack of medical evidence to conclude that Slayton's reports of her limitations due to pain are "only very minimally credible." The ALJ acknowledged that "symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone" and recited the

statutory factors other than medical evidence which must be considered. *See* 20 C.F.R. § 415.929(c). The ALJ also noted Slayton's testimony regarding her pain and work limitations and considered the correspondence from her husband and son. The ALJ ultimately concluded, though, that Slayton's allegations of limitations due to severe pain were not credible for several reasons: doctors had thought her reports of pain were disproportionate to exam findings, her pain appeared to respond to conservative treatment, she had never mentioned some of her symptoms to doctors, and her work history was sporadic before her alleged onset date. These reasons are sufficient to support the ALJ's finding that Slayton's allegations regarding her pain were not fully credible. *See Schmidt v. Astrue*, 496 F.3d 833, 843–44 (7th Cir. 2007) (upholding credibility decision concerning claimant's subjective complaints of pain when ALJ considered testimony, normal examination findings, and daily activities in addition to objective medical tests); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803–04 (7th Cir. 2005) (upholding credibility decision when ALJ considered conservative treatment, failure to report certain symptoms to doctors, and inconsistency of reports of extreme pain with examiner's findings in addition to lack of objective medical test findings); *Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005) (upholding credibility decision when ALJ considered treatment, daily activity, and work history in addition to lack of objective medical evidence).

Slayton next argues that the ALJ erred in his credibility finding by misstating or ignoring parts of the medical record. She cites to a slew of medical records that she believes the ALJ mischaracterized or failed to consider. These include mild changes in her lungs, a physician's progress note mentioning her history of hepatitis C and chronic obstructive pulmonary disease, a physical therapy note indicating decreased shoulder strength and stability, the prescription of an electrical nerve stimulation unit, X-rays of her shoulders showing moderate degenerative changes, an MRI of her neck showing small protrusions, an MRI of her left shoulder and referral for left shoulder surgery, and treatment notes documenting her reports of fatigue and severe pain in her neck, shoulders, elbows, and legs. As Slayton notes, an ALJ does not need to discuss every piece of evidence in the record, although neither may the ALJ analyze only the evidence supporting his ultimate conclusion while ignoring the evidence that undermines it. *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

First, two of the medical records that Slayton faults the ALJ for overlooking were not before the ALJ when he issued his decision in September 2013. Those records—the results of an MRI of Slayton's left shoulder and the referral for left shoulder

surgery—were submitted later to the Appeals Council, which included them in the administrative record but also decided that this new evidence did not warrant review of the ALJ's decision. Medical records that were not available to the ALJ cannot be used to determine the correctness of the ALJ's decision. *See* 42 U.S.C. § 405(g); *Stepp v. Colvin*, 795 F.3d 711, 721 n.2 (7th Cir. 2015); *Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004); *Eads v. Sec'y of Dept. of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993). And Slayton has not argued—either in the district court or this court—for a remand to consider this new evidence, *see Stepp*, 795 F.3d at 721–26, so she has waived that contention.

As for the records that were before the ALJ, Slayton's appellate claim fails because the ALJ properly considered the record as a whole and did not neglect to address any evidence undermining his credibility finding. Contrary to Slayton's assertions, the ALJ did consider the X-rays of Slayton's shoulders and knees and MRIs of her neck and spine. The ALJ also considered many of the notes she characterizes as ignored, but he focused on the physicians' examination findings rather than dwell on Slayton's self-reports of pain documented in those notes. Although the ALJ did not specifically analyze how Slayton's hepatitis C diagnosis affects her ability to work (other than noting her complaints of fatigue), that is because nothing in the record suggests that Slayton manifested any symptoms of hepatitis C which would limit her functioning. The ALJ summarized the significant medical findings in the record as related to Slayton's functional limitations, and no doctor ever opined that she had greater limitations than what the ALJ found.

In sum, because the ALJ did not ignore any line of evidence and substantial evidence supports his decision, we uphold it.

AFFIRMED.