## NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 6, 2015
Decided December 8, 2015

**Before**

DIANE P. WOOD, *Chief Judge*

RICHARD A. POSNER, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 15-1273

| | |
|---|---|
| BARBARA STAHL,<br>    *Plaintiff-Appellant*,<br><br>    *v.*<br><br>CAROLYN COLVIN, Acting<br>Commissioner of Social Security,<br>    *Defendant-Appellee*. | Appeal from the United States District<br>Court for the Northern District of<br>Illinois, Eastern Division.<br><br>No. 13 C 752<br><br>Mary M. Rowland,<br>*Magistrate Judge*. |

## O R D E R

Barbara Stahl is seeking disability benefits based on an array of physical and mental problems, including diabetic neuropathy, degenerative disc disease, depression, and anxiety. Thus far, her efforts have been unsuccessful. An administrative law judge found that, despite these serious medical conditions, she retains the residual functional capacity (RFC) to perform light work with certain limitations; the district court upheld that decision. Stahl challenges the ALJ's findings concerning her credibility, the weight accorded the opinions of treating physicians, and the judge's assessment of her residual functional capacity. We conclude that these findings are not supported by substantial evidence, and so we reverse.

# I

## A

At the age of 50, Stahl applied in August 2011 for disability insurance benefits and supplemental security income, claiming that as of June 2010, diabetic neuropathy, degenerative disc disease, depression, and anxiety rendered her unable to hold a job. For 12 years before that onset date, Stahl had worked as a childcare provider, running a daycare center out of her home; before that she occasionally performed data entry as a temporary employee. Since mid-2010, Stahl has neither held a job nor been self-employed, although she has continued to babysit her nephew's children once a week, typically at night while they are sleeping.

Stahl first complained of burning pain in her feet when she visited an emergency room in July 2010. She told the doctors there that she had been in pain for the previous five months and that she had a history of diabetes, which was being treated with two oral medications, Glyburide and Metformin. A physical examination revealed that Stahl was alert and oriented, and she had normal neurological responses to a motor exam and a sensory exam. The doctor prescribed her Norco as a pain reliever. Stahl recently had lost her insurance, and so a social worker provided her with information on obtaining ongoing medical care and medications.

Stahl next sought care in February 2011, when she complained that the pain in her feet was so bad that she could barely walk; nonetheless, she reported that her overall pain level was a low 2 out of 10. A physical exam was labeled "normal," but the results were troublesome enough to prompt the treating doctor to prescribe medications for her diabetes, hypertension and cholesterol, and he added Prozac for her anxiety and naproxen and Tylenol for her neuropathy. When Stahl requested prescription refills in June 2011, she admitted that she had stopped taking her diabetes medication because it was "too strong for her," and she reported that she had no pain. The treating doctor accordingly lowered the dosage on her diabetes medication. Two months later, though she was still taking Norco, Stahl reported pain and neuropathy, for which the doctor prescribed Neurontin.

A few days after that encounter, Stahl went to the emergency room, complaining of tingling and numbness in her feet, anxiety, and depression. The doctor there determined that she had normal strength and range of motion after a musculoskeletal

exam, and that she was alert, oriented, and cooperative. He gave her a psychiatry referral to address her anxiety and depression.

One month later, in September 2011, Stahl returned to the emergency room with reports of numbness and tingling in her arms. She was seeking a refill of her pain medication and treatment for a ganglion cyst (a noncancerous lump that can cause pain if it is pressing on a nerve) on her right wrist. She again complained of pain and numbness in her hands and feet (signs of neuropathy) when she visited Dr. Fahmeeda Begum in March 2012. Dr. Begum, a primary care physician, characterized Stahl's diabetes as well-controlled, but she recommended an increased dosage of Gabapentin after concluding that Stahl's neuropathy had not responded to treatment.

Stahl saw a neurologist, Dr. Maria Gragasin, in May 2012, and reported again that she had experienced burning pain in her extremities for the previous two years and a sensation of pins and needles in her extremities. She added that she had mild low-back pain, but she denied a history of *recurrent* neck or low-back pain. Dr. Gragasin noted that Stahl was alert and oriented and had normal muscle tone, but she had a reduced sense of touch in her hands and feet. Dr. Gragasin concluded that she probably had peripheral neuropathy caused by her diabetes, and potentially by alcohol as well. She advised Stahl to stop drinking.

Stahl returned to Dr. Gragasin in July 2012 for a follow-up appointment for the burning pain in her hands and feet. Dr. Gragasin noted that Stahl had denied a history of neck or lower-back pain at the previous visit, but that she now reported "almost constant neck pain for several years," as well as recurrent lower-back pain that radiated to her right thigh. Dr. Gragasin ordered CT scans of her spine, the results of which showed degenerative disk and joint changes on some vertebrae and some impingement of the foramen (the opening in the vertebrae that nerves travel through). The impingement was mild on some vertebrae and severe on others.

Stahl also sought treatment for her mental condition. She first visited Dr. Regina Hall-Ngorima in August 2011, after she had received a psychiatry referral from an emergency room doctor earlier that month. Stahl reported anxiety and depression, especially after her son got into legal troubles two years earlier. She also reported a head tremor which prevented her from going to the doctor, going on job interviews, and getting her hair done. She told Dr. Hall-Ngorima that she had run a daycare facility in her home until the year before (2010), when she lost her accounting job. Dr. Hall-Ngorima noted that Stahl was very tearful, had poor grooming, was depressed and

anxious, but was logical and linear with no suicidal ideation, delusions, or hallucinations. Dr. Hall-Ngorima diagnosed her with anxiety, ruled out social phobia as a diagnosis, and prescribed Citalopram and Clonazepam.

The next month Stahl saw Dr. Jeffrey Karr, a psychologist, at the request of the Social Security Administration. She told Dr. Karr that she previously enjoyed hobbies like crocheting and bowling, but this stopped six years ago when her son's father died. She currently talks to friends twice every two weeks, and her sister visits multiple times a week. She stated that she needs help with laundry and chores and depends on her son for help. She reported occasional alcohol use, claiming that the last time she drank had been a month earlier when she had five beers. Dr. Karr noted that her prescriptions from Dr. Hall-Ngorima had not been filled, and though Stahl looked exhausted, there were no visible signs of physical discomfort or obvious motor difficulties, including tremors. He characterized her as eager to talk and stated that she offered coherent, intelligible responses. He diagnosed her with a history of alcohol abuse and depression. He also concluded that she did not "exhibit overt signs of substance usage, gross psychopathology, cognitive difficulty or visible physical distress," and that, if she was substance-free, she could handle money.

Stahl followed up with Dr. Hall-Ngorima a few times. At a visit in November 2011, she reported that she took two Clonazepam to sleep at night and one during the day every two to three days, with no noticeable side effects. At her next visit, in February 2012, Stahl stated that she was sleeping better, had no side effects from her medication, and only took a Clonazepam in the morning if she planned to go out. The doctor found Stahl to be alert and oriented, with adequate grooming; she concluded that Stahl's condition was improving. In support of Stahl's request for assistance from her town, Dr. Hall-Ngorima submitted a form in which she opined that Stahl suffered from severe social phobia and depression and thus could not work. When Stahl returned in July 2012 for another appointment, Dr. Hall-Ngorima concluded that her condition was worsening. On that occasion, though Stahl's grooming was adequate, Stahl was crying and sweating and had a fine tremor. Dr. Hall-Ngorima adjusted her medications.

Stahl also visited Dr. Priya Pillai, a family physician, in November 2011, who offered her opinion on Stahl's ability to work. Dr. Pillai believed that Stahl's physical limitations were severe, and that she could lift only 5 pounds at a time, stand for less than an hour in an 8-hour workday, and sit for less than 2 hours. The medical evidence in the record does not include any record of treatment that Stahl received from Dr. Pillai.

Dr. Towfig Arjmand, a state agency consultant, reviewed Stahl's file in October 2011, but he did not examine her. On the basis of the paper record he concluded that she could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for 6 hours of an 8-hour day, and sit for 6 hours. He specified some limitations: she could never climb ladders or ropes and should avoid concentrated exposure to hazards such as machinery and heights. Dr. George Andrews seconded those findings in February 2012, also without examining her.

Dr. Marva Dawkins conducted a psychiatric review of Stahl's file in October 2011. She noted that Stahl suffered from depression, anxiety, and alcohol abuse, and concluded that Stahl had moderate limitations in daily living activities, social functioning, and maintaining concentration, persistence, and pace. In completing the mental RFC assessment, Dr. Dawkins noted that Stahl had moderate limitations in understanding, remembering, and carrying out detailed instructions, as well as moderate limitations in her abilities to complete a normal workday without interruption, to interact with the general public, and to respond to changes. Dr. Dawkins concluded that Stahl has the mental capacity to do simple, routine tasks for jobs where there are no strict production quotas, and that she would perform best with minimal contact with the general public.

Dr. Donna Hudspeth conducted a second psychiatric review in February 2012. She noted depression and alcohol abuse, moderate difficulties in maintaining concentration, persistence, or pace, and mild difficulties in daily living and social functioning. Dr. Hudspeth concluded that Stahl could perform simple one- and two-step tasks and could communicate with supervisors and fellow employees, but characterized her as "manipulative" and thought that she should not work with the general public.

B

At the hearing before the administrative law judge in 2012, Stahl testified that she had diabetes and neuropathy in her hands, legs, and feet. These conditions, she said, caused severe and limiting pain. She could no longer pick up a child or change a diaper, nor could she lift or open a gallon of milk. She lies down seven out of eight hours in a day, and is able each day to stand for only about half an hour and walk for 15–20 minutes. She reported that she is not able either to stand or to use her hands for data entry for more than one-third of a workday. Because of her peripheral neuropathy, she must use a coat with ties and Velcro shoes. She also stated that doctors told her to keep off her feet and keep them elevated above her head, to limit swelling. She gets

nausea-inducing headaches for a few hours every day and has a head tremor, which at times has been so severe that it prevented her from completing an eye test. She takes medications for these conditions, but she experiences substantial side effects from them, including fatigue, blurry vision, vomiting, weight gain, drowsiness, tremors, and difficulty concentrating.

Stahl also explained that her activity and interaction with others was very limited. She said that she was very forgetful and needed to write things down. She leaves the house once a week to go grocery shopping, which she does with her sister's assistance. She described a limited social life: she does not have friends and does not spend time with others; she gets along with others but feels isolated; but she does go to her sister's home for holiday celebrations. She has no hobbies. She feeds the cats and does the laundry occasionally, but her son does most of the other chores at home. Stahl stated that she used to drink alcohol, but only at weddings and holidays, but had stopped drinking in 2009 or 2010, and could not drink presently because of her medications. Stahl told the judge that, after she became disabled in June 2010, she worked "maybe one day a week" babysitting her nephew's sons at night while her nephew was at work, but that her son was on hand in case anything happened.

Stahl's sister, Mary Fahy, also testified about Stahl's limitations. Fahy testified that she sees Stahl almost every day, that she drives her to the grocery store and to doctor's appointments. If Fahy is unavailable, Stahl takes the bus, but only to places she has been before. Fahy helps Stahl with chores around the house, including putting away the groceries and doing laundry; she said that Stahl's son did not help with chores at all. Fahy characterized her sister as "a recluse" with no friends, who has a "hard time communicating," and commented that there are days when Stahl cannot get off the couch. Fahy also stated that Stahl regularly has neuropathy flare-ups that cause significant pain, especially in the winter, and that Stahl frequently needs crutches to get around.

Based on this testimony and the reports from the physicians, the ALJ asked a vocational expert (VE) a series of hypothetical questions (varying the assumptions about physical and mental ability, but holding age, education, and work experience constant). We list them here by number:

- Assumption 1: a person who can perform light work, but lacks the ability to do detailed work for extended periods, cannot climb ladders, ropes, or scaffolds, can frequently climb ramps or stairs, but cannot have more than

occasional concentrated exposure to hazards, can occasionally interact with coworkers and the public, and can occasionally set goals and plan independently. VE response: such a person could perform unskilled light occupations, such as a ticket taker, a recreation attendant, or a mail clerk.

- Assumption 2: same as scenario 1, but also limited to occasional use of her arms and hands for fine or gross manipulation. VE response: there are no occupations for someone with those limitations.
- Assumption 3: same as scenario 1, but also limited to frequent, though not continuous, use of the upper extremities for fine or gross manipulation. VE response: the three occupations mentioned in response to hypothetical one would be available.
- Assumption 4: same as scenario 1, but the person could occasionally perform tasks requiring fine vision, such as reading. VE response: such a person could work as a recreation attendant, a ticket taker, or a cafeteria attendant.
- Assumption 5: a person limited to sedentary work (as opposed to light work in scenario 1), but with the additional limitations discussed in scenario 1. VE response: this hypothetical person would be able to work as a sorter, a final assembler, or a hand packager.
- Assumption 6: a person unable to leave her home four days a week. VE response: no occupations would be available.
- Assumption 7: someone limited to sitting for two hours and standing or walking for one hour in each eight-hour workday, who would also need to take breaks as needed throughout the day, and could not lift more than five pounds. VE response: no occupations would be available.

The ALJ applied the required five-step analysis in her written decision, see 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), and determined (step one) that Stahl had not engaged in substantial gainful activity since her alleged onset date; (step two) that Stahl's major depressive disorder, alcohol abuse, anxiety disorder, diabetes with neuropathy, and degenerative disc disease were severe impairments; (step three) that none of these equaled a listed impairment; (step four) that she had the residual functional capacity to perform light work, but with limitations on lifting, carrying, climbing, fine or gross manipulation with her hands, exposure to hazards, interactions with coworkers and the public, and detailed work for extended periods, and that those limitations prevented her from performing any past relevant work; and (step five) that she could work as a ticket taker, recreation attendant, or mail clerk (apparently relying on assumptions 1, 3, or 4).

In determining Stahl's RFC, the ALJ found that Stahl's testimony about the severity of her impairments was inconsistent with the medical record. No clinical findings supported Fahy's testimony that Stahl needed crutches to walk or Stahl's claim that she needed constantly to keep her feet elevated above her body. The ALJ was also bothered that Stahl had substantial gaps in treatment in 2010 and 2011; she drew the inference from those gaps that Stahl's symptoms were not as severe as she portrayed them. The ALJ thought that Stahl was inconsistent in her reports of side effects from her medications, sometimes characterizing them as severe and sometimes saying that there were no such effects. The ALJ also thought it significant that Stahl sometimes stopped taking her diabetes medication and failed to fill prescriptions from her psychiatrist. Mental-health doctors consistently found Stahl to be alert and oriented, and she did not exhibit overt signs of substance abuse, cognitive difficulty, or visible physical distress. The ALJ also noted that Stahl's reports about alcohol consumption did not add up: Stahl testified that she had stopped consuming alcohol in 2009 and 2010, yet she reported to doctors in 2011 and 2012 that she drank up to once a week, consuming five or six beers.

The ALJ declined to give any particular weight to the opinions of Dr. Pillai, who suggested significant physical restrictions on Stahl's ability to work, or Dr. Hall-Ngorima, who concluded that social phobia and depression prevented Stahl from working at all. Dr. Pillai's opinion was flawed because she relied too heavily on Stahl's self-reporting and failed to confirm Stahl's allegations with any clinical findings. The ALJ thought that Dr. Hall-Ngorima's opinion was inconsistent with evidence that Stahl had improved under her care with minimal treatment and with Stahl's activities. The ALJ accorded considerable weight to the opinion of Dr. Karr, the examining psychologist, who concluded that Stahl did not exhibit overt signs of substance usage, gross psychopathology, cognitive difficulty or visible physical distress. This contradicted (the ALJ said) Stahl's testimony that she had problems with functioning and memory. The ALJ relied heavily on the opinions of Dr. Arjmand and Dr. Andrews, the state agency medical consultants, who concluded that she could do light work with some limitations. The ALJ accorded some weight to the opinions of Dr. Dawkins and Dr. Hudspeth, the state agency mental health consultants, who found that Stahl could work with some mental-health limitations, but the ALJ rejected Dr. Hudspeth's conclusion that Stahl should not have any contact with the public.

The district court, acting with the consent of the parties through a magistrate judge (28 U.S.C. § 636(c)), concluded that substantial evidence supported the ALJ's decision. The court concluded that the ALJ's credibility determination was not patently

wrong. It credited the ALJ with comprehensively evaluating Stahl's credibility and RFC, and it agreed with the ALJ that there were inconsistencies between Stahl's testimony and the medical record. The court found that the ALJ gave good reasons for her decision not to give controlling weight to the opinions of Stahl's treating doctors. Last, the court described the ALJ's RFC determination as "thorough, thoughtful, and fully grounded in the medical evidence, including physicians' opinions and Stahl's testimony."

## II

On appeal, Stahl argues both that the ALJ's adverse credibility determination is based on either trivial or nonexistent inconsistencies, and that her RFC determination is not supported by substantial evidence. We take these points in turn.

Although the ALJ's credibility discussion got off to a bad start by using the boilerplate language we repeatedly have criticized, see, *e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 644–45 (7th Cir. 2012), we do not rest our decision on this point. As we have acknowledged, the use of this unfortunate and circular formula "does not automatically undermine … the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013). Here, the single sentence of boilerplate is found within an eight-page discussion of the alleged inconsistencies between Stahl's testimony and the medical evidence in the record. The ALJ identified several areas in which she believed there were inconsistencies between the medical evidence and Stahl's testimony, including Stahl's varying admissions about her consumption of alcoholic beverages, the lack of medical evidence supporting her supposed need for crutches, the question whether she was impaired by side effects from her medications, gaps of seven months and four months in her treatment, and her occasional lack of compliance with medical directions. Though Stahl testified that she was extremely forgetful, mental-health doctors frequently found her to be alert, oriented, and without evidence of psychotic features.

Stahl argues that these apparent contradictions are readily explainable. Her alcohol use played no part in the ALJ's RFC, and so it does not matter whether she stopped drinking altogether in 2009 or 2010, or if she stopped her excessive drinking and reduced her consumption to a socially acceptable five or six beers per week. Although it appears that no doctor ever prescribed crutches for her, no prescription is necessary; crutches can be bought by anyone who wants them. Stahl, recall, had no insurance—a fact that also influenced the frequency of her doctor visits. As for her reports about side effects, the ALJ never considered the possibility that they varied as her medications were

adjusted, or that she saw no benefit in reporting them to the doctors because there was nothing to be done about the problem. We held in *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009), that a failure to report side effects to doctors does not, in and of itself, discredit complaints of "disabling pain." *Id.*

It is also troubling that the ALJ drew an adverse inference from Stahl's failure to pursue additional testing and treatment for her degenerative disc disease. The ALJ noted that, according to the medical evidence in the record, hospital staff provided Stahl with information on obtaining healthcare without insurance during her July 2010 visit to the emergency room for foot pain. But the ALJ never asked Stahl if her lack of resources limited her ability to see the doctor in general or for her degenerative disc disease in particular. See *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). Given her lack of insurance, Stahl took the position that she simply had to live with the back pain, which in itself appears not to have been her most serious problem.

There are also problems with the ALJ's evaluation of Stahl's work history and its relation to the unrebutted testimony about Stahl's extremely limited daily activities. The ALJ wrote that Stahl's testimony about her work in 2010 was "vastly inconsistent" with the work history that she reported to doctors, but that conclusion finds no support in the record. Stahl reported to Dr. Hall-Ngorima that she was operating a daycare center in her home until 2010, when she lost her "accounting job." At the hearing before the ALJ, Stahl testified that in 2010 she babysat her nephew's children (with the help of her son) one day a week while the nephew worked at night. There is nothing inconsistent in those two statements. The information Stahl reported to Dr. Hall-Ngorima was about her work *before* she became disabled in June 2010, while her hearing testimony was about the work she performed *after* the onset of her disability—work that was for a family member, that consumed a small fraction of a work-week, and that was done with assistance.

Stahl also contends that the ALJ did not accord sufficient weight to the opinions of Dr. Pillai, a treating physician, and Dr. Hall-Ngorima, a treating psychiatrist. These are secondary points, however. Even if we assume that the ALJ was justified in discounting Dr. Pillai's opinion that Stahl could lift only five pounds, stand for one hour a day, and sit for two hours a day (because it was based only on Stahl's subjective responses and was not consistent with the other medical evidence in the record), and Dr. Hall-Ngorima's opinion that Stahl could not work for at least twelve months due to severe social phobia, these opinions have at most a peripheral bearing on Stahl's

condition. Stahl's peripheral neuropathy, which was barely mentioned by the ALJ, required a much harder look.

We conclude that the ALJ's credibility determination finds no support in the evidence of record, and that her conclusion that Stahl remains able to perform jobs such as ticket taker, recreation attendant, or mail clerk in the national or regional economy fails to take account of all of the evidence. We therefore REVERSE the district court's judgment and REMAND this case to the agency for further proceedings.